No. 68,147

STATE OF KANSAS, *Appellee*, v. ALONZO CHEEKS, *Appellant*.

(853 P.2d 655)

Opinion filed May 28, 1993.

*Benjamin C. Wood*, special assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Debra S. Byrd*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is the direct appeal of Alonzo Cheeks from his jury conviction of first-degree murder, the killing of a human being committed in the perpetration of abuse of a child, in violation of K.S.A. 1992 Supp. 21-3401(a)(2).

Alonzo Cheeks was convicted of killing Mary Anderson. Mary was born on May 4, 1988, and she died on September 16, 1989.

Cheeks and Mary's mother, Felisa Anderson, lived together in September 1989. A number of children lived with them, including Anderson's small children and several of her young siblings.

Anderson went to the store during the afternoon of September 16, 1989. Alonzo was the only adult who stayed at the residence with the children.

When Anderson returned, Alonzo was at the door saying that there was something wrong with Mary. Alonzo said that Mary "had turned colors and stuff." Mary was lying on a mattress on the living room floor with nothing on. When Mary did not respond to mouth-to-mouth resuscitation, she was taken to the hospital. Unsuccessful resuscitation efforts were continued at the hospital for approximately an hour.

The external portion of the autopsy revealed a number of bruises and lacerations on her head, particularly on the inside of her lips. There was a bruise on the left side of her chest.

The major features revealed by the internal examination were in her head. Her skull was fractured on the side. There was hemorrhage around and in the brain. There was hemorrhage underneath her scalp, over her eyes, in the tissues of her chest, and around her liver.

The doctor who performed the autopsy was of the opinion that Mary's death was due to the hemorrhage inside her head. Based on the combination of the injuries inside the head and under the scalp, the fracture of the skull, and the external bruises and lacerations, he concluded that her death was due to "child abuse or beating."

Cheeks gave two taped interviews to police during the evening of September 16, 1989. Cheeks said that when Anderson went to the store he stayed inside and watched television. Demon, only a few months old, stayed in with him. At first Mary was in the house, and then she went out. When she went outside she was wearing her diaper, a dress, and socks.

Cheeks said that he opened the door and put Mary out on the porch because she was crying at the door. When he put her out, he saw other children outside, including Bub, age five, and Pasha, age three or four.

Sometime later the children wanted to come in to watch television, but Cheeks would not let them in. Cheeks had dozed off. He said that Mary had been outside approximately 50-60 minutes.

Cheeks reported hearing a bang. Cheeks said that Bub was holding Mary under the armpits. Bub said that Mary was not breathing and that Pasha had done something.

Cheeks took Mary from Bub. He said that she was "just hanging," her eyes were open just a little, and that she did not breathe except for two deep breaths. Cheeks stripped off her clothes and diaper, hit her buttocks, and hit her face. Cheeks removed her clothes and diaper because he had observed some paramedics do that to someone else. He put Mary on the bed in the living room. Cheeks said that, at that time, Anderson returned with some other adults, and they took over.

When Mary was taken to the hospital, Cheeks stayed at the residence with the other children. At that time, Bub told Cheeks that Pasha pushed Mary into a tire or tire rim. Bub also said that Pasha pushed Mary down some stairs.

Anderson testified that when she was at the hospital with Mary she did not know what had happened to Mary. When she went home, she talked to the other children. Bub told her about the tire and about Pasha pushing Mary down the stairs. Cheeks told her that Bub brought Mary into the house and told him that Pasha had pushed her down the stairs. Anderson testified that Cheeks did not mention a tire to her.

Officer Anthony Clemons testified that he talked with Anderson at the hospital. Anderson said that Cheeks told her that Mary had been pushed into a tire by one of the other kids and that the tire fell on her.

Cheeks denied hitting Mary on September 16, 1989, other than on the face and buttocks when he was trying to revive her. He said that only one time before had he "whipped" Mary. He hit her one time on the arm and then made her stand up for awhile. He hit her because she had defecated on the floor in several rooms and was playing in her feces, throwing it on the wall, and laughing. He had to clean up the mess.

Cheeks said that on September 16, 1989, Mary had defecated in the kitchen, and it had gotten on the carpet or cupboard. He said that he was not upset by it because her mom had to clean up the mess.

Cheeks described Mary as a child who cried and cried when she wanted something. Officer Pat Luther testified that Cheeks told him that Mary cried a lot and got on people's nerves.

Richard Krugman, M.D., a pediatrician who heads the C. Henry Kemp National Center for the Prevention and Treatment of Child Abuse and Neglect at the medical school at the University of Colorado, concluded that Mary's death resulted from physical abuse and beating, not from accidental trauma. His conclusion, in this case as in others, was based principally on the mismatch between the medical findings and the explanation(s) which had been offered for the child's injuries. He testified that another factor which was considered was behavior on Mary's part which might trigger abuse of a child. The two most common "behavioral triggers" are crying and defecating or urinating.

The pathologist testified that Mary's injuries were not consistent with either a tire falling on her or her falling down stairs. He testified that her skull fracture was very fresh and that it could only have been caused by a considerable amount of force.

We first consider whether the district court committed reversible error in instructing the jury. Cheeks complains of the following instruction:

"No. 10

"Mr. Cheeks is charged with the first degree murder under the rule of law sometimes called the 'felony murder rule.' It is not a defense to the charge of murder, under the felony murder rule, that the killing was accidental.

"You are further instructed that if you are convinced beyond a reasonable doubt that it was reasonably foreseeable that a killing might occur in the perpetration of the crime of child abuse, the exact manner in which that killing might occur need not be foreseen."

Defense counsel objected to the district court's giving the instruction on the following grounds:

"We object to the instruction labeled number 10 as unnecessary. Basically, it presumes guilt, puts the jury in a mindset of finding guilt. Is unnecessary. Instruction Number 9 fully and sufficiently instructs the jury as to how they make their decision."

The district court overruled the objection. Instruction 9, to which defense counsel referred, states:

"The defendant, Alonzo D. Cheeks, is charged with the crime of murder in the first degree. Mr. Cheeks pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That Mr. Cheeks killed Mary J. Anderson;
2. That such killing was done while in the commission of the crime of child abuse, a felony; and
3. That this act occurred on or about the 16th day of September, 1989, in Sedgwick County, Kansas.

"The elements of the crime of child abuse are as follows:

1. That the defendant willfully and cruelly beat or willfully inflicted cruel and inhuman bodily punishment upon a child;
2. That the child was under the age of eighteen years of age; and
3. That this act occurred on or about the 16th day of September, 1989, in Sedgwick County, Kansas."

Instruction 11 states the following:

"As used in these instructions the following words are defined as indicated.

" 'Intentionally' means conduct that is purposeful and willful and not accidental.

" 'Willfully' means conduct that is purposeful and intentional and not accidental."

Cheeks' argument with regard to Instruction 10 focuses on the statement that it is not a defense that the killing was accidental. His defense was that Mary's death was accidental. His concern is that the jurors could interpret the instruction as directing them to disregard the defense theory. The State counters that Instruction 10 does not deprive Cheeks of his defense when it is read in conjunction with Instructions 9 and 11. The State quotes *State v. Morris*, 244 Kan. 22, 23, 765 P.2d 1120 (1988), for the following principles:

"Jury instructions are to be considered together and read as a whole, without isolating any one instruction. [Citation omitted.] If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]"

The evidence presented the jury with two choices. The jury could have found that Mary died as the result of injuries she sustained in an accident which occurred while she was outside with the other children, or the jury could have found that Mary died as the result of injuries she sustained as a result of a beating by Cheeks.

Instruction 10 is somewhat confusing because the principle it states better fits circumstances which would be charged under K.S.A. 1992 Supp. 21-3401(a)(1), "the killing of a human being committed . . . [i]n the perpetration of or attempt to perpetrate any felony," than the circumstances of the present case. In a typical felony-murder case not based on child abuse, a gun might be fired during an armed robbery and a store clerk die from the gunshot wound. The evidence would establish that there was an armed robbery, the underlying felony, and that the store clerk was killed during the robbery. The jury would not be charged with making a choice between robbery occurring and the store clerk dying in some unknown, unrelated manner. In the present case, the jury was charged with determining whether Cheeks beat Mary and she died or whether Mary was involved in an accident while outside and she died. In the armed robbery circumstances, the jury should understand from the pertinent portion of Instruction 10 that its verdict did not depend on whether the trigger was pulled purposefully or during a struggle. In the present circumstances, where the jury had to decide between an accident and a beating as the efficient cause of Mary's death, it may have been confusing for the jury to be instructed that it is not a defense that the killing was accidental. In the present case, the first paragraph of Instruction 10 should have been clarified or omitted.

However, notwithstanding our criticism of Instruction 10, we agree with the State that Instructions 9 and 11 save Instruction 10 from being misleading because the jury could not convict Cheeks under Instructions 9 and 11 if it determined that Mary had suffered a serious accident while playing outside. Under Instruction 9, to convict Cheeks, the jury had to find that Cheeks killed Mary while willfully and cruelly beating or inflicting cruel and inhuman bodily punishment upon Mary. We do not find that Instruction 10, when read in conjuction with Instructions 9 and 11, constitutes error.

On appeal, Cheeks also complains of the district court's failure to give an additional instruction on intent. In this regard this court has stated:

"In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence.

When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction." *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992).

Defense counsel requested the district court to give PIK Crim. 2d 54.01-A (1988 Supp.):

"In order for the defendant to be guilty of the crime charged the state must prove that his conduct was intentional. Intentional means willful and purposeful and not accidental.

"Intent or lack of intent, is to be determined or inferred from all of the evidence in the case."

The district court declined on the grounds that "child abuse requires a specific criminal intent" and another instruction was being given on intent. It was the view of the district court that the defendant was getting what he wanted, but in a slightly different form.

We agree. The substance of the requested instruction was present in Instructions 9 and 11 which were given by the district court. This court has stated: "Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused." *State v. Crabtree*, 248 Kan. 33, Syl. ¶ 6, 805 P.2d 1 (1991). Considering the instructions as a whole, we cannot say the failure to give PIK Crim. 2d 54.01-A was error.

We next consider if the district court committed error in admitting the testimony of Dr. Richard Krugman, the State's expert witness. This court recently stated:

"The admissibility of expert testimony is within the broad discretion of the trial court. A party claiming an abuse of trial court discretion bears the burden of showing abuse of discretion. The test on appellate review of whether the trial court abused its discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision." *Marshall v. Mayflower Transit, Inc.*, 249 Kan. 620, Syl. ¶ 8, 822 P.2d 591 (1991).

Dr. Krugman testified on behalf of the State. Dr. Krugman is a member of the Start Team, "which is a state and regional team which is headed by an attorney, former criminal attorney, and consists of an attorney, a social worker, a pediatrician, . . . a forensic psychiatrist, and a civil attorney who review and consult on criminal cases of abuse and neglect." He testified that the

"Start Program consults on approximately a hundred cases a year." As a member of the Start Team, Dr. Krugman was asked to testify in the present case. He testified that he reviewed x-rays, medical records, the autopsy report, police reports, and the transcripts of Cheeks' taped interviews.

Dr. Krugman testified that he had an opinion "as to the cause of the injuries that were suffered by Mary J. Anderson that led to her death." Defense counsel made the following objection: "Objection, your Honor, foundation; request that I could voir dire the witness as to his review of those documents." The district court overruled the objection and denied the request, stating that counsel would have an opportunity to cross-examine Dr. Krugman. Dr. Krugman expressed the following opinion: "Our opinion in reviewing these materials was that Mary was a victim of non-accidental trauma; that is, she had been physically abused and that her death was a result of physical abuse and beating."

On appeal, Cheeks complains that Dr. Krugman testified on behalf of an "abuse determining committee" and that his testimony invaded the province of the jury. In this regard, Dr. Krugman testified that the "diagnosis" of child abuse "is primarily made on the basis of the discrepant history," i.e., the injuries are not of a sort which could have been caused by the event(s) which were recounted. It is Cheeks' position that Dr. Krugman passed upon his credibility by "testif[ying] that he did not believe that the information in Alonzo's statements concerning what Bub told him had happened was accurate." In addition, Cheeks argues that Dr. Krugman's conclusions lack solid support. He contends that they were based in large part on police reports, which Dr. Krugman had no expertise in deciphering. He further contends that Dr. Krugman did not hold himself out to be a forensic pathologist and that Dr. Krugman conceded he could not determine cause from examination of injuries. Cheeks does not give a record reference for this last contention.

Cheeks principally relies on *State v. Bressman*, 236 Kan. 296, 689 P.2d 901 (1984), where the admission of improper expert testimony was held to be prejudicial error. Bressman was convicted of rape; he maintained no sexual contact had occurred despite the victim's advances. Tests were conducted on saliva, hair, urine, clothing, and vaginal swabs; there was a physical

examination of the victim. None of these tests showed that sexual acts had taken place, and there was no evidence of trauma. The State's expert witness was the physician who examined the victim. The physician testified that, in her opinion, the victim was raped. This court held that the opinion lacked a proper foundation, was unnecessary to aid the jurors' understanding, and required an evaluation of the credibility of the victim's account. The court stated:

"There was no showing that she was trained as an expert in psychiatry. There was no showing that the bases for her conclusions were generally accepted in the field of psychiatry. Her conclusions were not based on a psychiatric examination and diagnosis. Although she had had some contacts in the past with women who came to the hospital claiming they had been raped, her conclusion was essentially based on the story related to her by Mrs. T and her physical examination of Mrs. T which was negative in result.

"We further hold that a jury could properly assess the state of mind and actions of Mrs. T following the arrest of the defendant. As noted in *Lollis* [*v. Superior Sales*, 224 Kan. 251, 580 P.2d 423 (1978)], the basis for the admission of expert testimony is necessity. Here the normal experiences of laymen jurors would permit them to draw proper conclusions from the evidence presented by the State. In addition, Dr. Stass-Isern, in arriving at her opinion that Mrs. T had been raped, of necessity had to pass upon the credibility of Mrs. T's story. The legal principles followed in *Lollis v. Superior Sales Co.* and *Smith v. Estate of Hall*, [215 Kan. 262, 524 P.2d 684 (1974),] are applicable and precluded the admission of Dr. Stass-Isern's opinion that Mrs. T had been raped." 236 Kan. at 303-04.

The State would distinguish *Bressman* on its facts and for the following reason: "While Dr. Krugman testified that, in his opinion, Mary had been physically abused and she died as result of physical abuse, it remained for the jury to determine whether the defendant physically abused Mary." This is not all that different from the examining physician testifying that, in her opinion, the victim had been raped, and it remained for the jury to determine whether Bressman had raped her.

Cheeks also cites *State v. Clements*, 244 Kan. 411, 770 P.2d 447 (1989); *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 (1986); and *State v. Lash*, 237 Kan. 384, 699 P.2d 49 (1985). In *Lash*, the court stated that the result is controlled by *Bressman*. The holding in *Lash* is as follows: "A certified psychologist, who is qualified as an expert witness and who has interviewed the alleged victim, may not testify that in his opinion the alleged victim had

been sexually molested by the defendant." 237 Kan. 384, Syl. ¶ 2.

In *Jackson*, a social services supervisor and a social worker, both with extensive specialized training and experience in child abuse investigation, were each permitted to testify that, in her opinion, the child was telling the truth and was sexually abused by Jackson. The court discussed the applicability of its decisions in *Lash* and *Bressman*, determined that *Bressman* is "somewhat distinguishable in that the physician in the *Bressman* case did not have psychiatric training," and noted that in *Lash* and *Bressman* the victims testified. 239 Kan. at 469-70. Despite these differences, the court concluded, as it had in *Lash* and *Bressman*, that it was improper for the district court to permit the witnesses to give their opinion testimony. The court reasoned:

"Here, the witnesses attempted to serve as human lie detectors for the child and both told the jury that in their professional opinions the child was truthful and the defendant was guilty as charged. We are convinced that it was the function of the jury to hear the testimony of the witnesses as to what the child said, and then to make a determination of the reliability of the child's statements. K.S.A. 1985 Supp. 60-460(dd) provides a substantial exception to the hearsay rule in child molestation cases. We are not prepared to enlarge that exception, or to enlarge the scope of permissible expert testimony, in order to leave the determination of the truthfulness of the victim of a crime up to the judgment of expert witnesses. It must be determined by the jury." 239 Kan. at 470.

K.S.A. 1992 Supp. 60-460(dd) excepts from the hearsay rule statements of alleged child victims which would prove the crime. The only child's statement in the present case is not that of the victim and exculpates rather than incriminates Cheeks. The statutory basis for *Jackson* does not have application in the present case, but the underlying rationale does. This court disapproves the practice of expert witnesses telling the jurors whom to believe.

*Clements* involves another consideration. The State's expert witness described a profile of sexual offenders, in particular their treatability and psychology. The witness had never talked with Clements. In closing argument, the prosecutor tied the expert witness' general profile of sexual offenders to Clements. 244 Kan. at 417. On appeal, Clements argued that "the only logical inference that the jury could have drawn from [the expert's] testimony was that Clements fit the profile of the typical child sexual of-

fender and was, therefore, guilty of the offense charged." 244 Kan. at 418. The court agreed and stated: "Here, the expert's testimony detailing the characteristics of the individual who typically sexually abuses children did not assist the jury in determining if the child was sexually abused by Clements. 244 Kan. at 421.

The pertinent syllabus paragraph from *Clements* states: "Evidence which only describes the characteristics of the typical offender has no relevance to whether the defendant committed the crime in question and the only inference which may be drawn from such evidence, namely that a defendant who matches the profile must be guilty, is an impermissible one." 244 Kan. 411, Syl. ¶ 3.

In the present case the expert witness described "the two most common behavioral triggers that lead to an assault or abuse of a child." He identified children's crying and defecating as those "triggers" and testified as follows:

"[W]hen those behaviors occur in the presence of an individual who is stressed and isolated and no one else can help with the frustration that many people feel when they're trying to take care of children who often can become difficult, that may lead to the explosion that occurs around the physical abuse or physical assault of a child."

Then he tied the profile to the defendant and Mary:

"Q. Doctor, in reviewing in particular the case of Mary Anderson, did you find any behavioral triggers that were present?

"A. Well, the law enforcement reports reflected in their interviews the loss of bowel control and, in fact, she had—she apparently had defecated on the carpet and she also—there was also in the interviews discussion of crying and her crying behavior, particularly when her mother left, that she cried a great deal. Either—both of those are present in this case. Certainly, the loss of bowel—of bowel control which, in a 16 month old, you wouldn't even call it a loss of bowel control because you don't expect a 16 month old to have bowel control but that defecation on the carpet I think was likely a trigger in this case."

The inference is that, because Mary had cried and defecated in the kitchen on the day she died, Cheeks must be guilty of beating her to death. Crying, however, is typical behavior for 16-month-old children, and the record is not clear if Mary had a dirty diaper or had defecated on the kitchen floor. This testimony did not aid or assist the jury in determining if Cheeks

physically abused Mary. It is not relevant to whether Cheeks committed the crime charged. Here, as in *Clements*, the inference is an impermissible one, and the admission of the expert testimony is an abuse of discretion and reversible error.

In view of our decision, we need not address the final issue raised by the defendant.

Reversed and remanded for a new trial.