No. 95,233

STATE OF KANSAS, *Appellee*, v. MARCY FAITH CARAPEZZA, *Appellant.*

(191 P.3d 256)

Opinion filed August 22, 2008.

*Julia Spainhour*, of Northeast Kansas Conflict Office, argued the cause and was on the brief for the appellant.

*Marc Goodman*, county attorney, argued the cause, and *Paul J. Morrison*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: Marcy Faith Carapezza appeals her convictions for felony murder, aggravated burglary, aggravated robbery, and misdemeanor theft. Carapezza contends the district court erroneously admitted evidence in violation of her constitutional rights and the rules of evidence. This court concludes that prejudicial error occurred in the course of the trial, and the case is remanded for retrial.

Sixty-four-year-old Mary Clark was found dead in her home on May 5, 2004. A glove had been shoved into her mouth, and she had been beaten about her head with a blunt object. Although there were no signs of forced entry into Clark's house, the drawers in Clark's bedroom furniture had been pulled out and the contents were in disarray and her purse was missing.

Police found a note and a receipt for a balance inquiry from Clark's bank account in Clark's mailbox. The note and the receipt were attached to Clark's bank debit card. The bank receipt was dated May 4, 2004, and the attached handwritten note, which was addressed to Clark from Mollie Paico, read:

"It's about 1:15 p. Here's your card. Were you asleep? I will just call you later. Let you know. I didn't get gas or go to the store. I will take you Friday when I get back. Mollie"

Police obtained Clark's bank records and discovered that three of Clark's recent checks did not have an authorized signature. Two of the checks were dated May 1, 2004, and made payable to Carapezza for a total of $160. The third check was also dated May 1, 2004, and made payable to S&S Oil and Propane for $55. Bank personnel also informed police that activity on Clark's debit card increased during the time immediately preceding Clark's death. On April 30, 2004, someone used Clark's debit card to make four purchases totaling over $400. Police later determined that three of the purchases were made by Mollie Paico and the other purchase was made by Carapezza while Paico waited in her car. In addition to the purchases, someone also withdrew $205 from Clark's checking account at an automated teller machine (ATM) on April 30, 2004. Although the person withdrawing the money at the ATM was standing outside the focal range of the video camera in the ATM machine, police were able to identify the person as Mollie Paico based on video surveillance from another nearby bank. On May 4, 2004, Paico was observed checking the account balance in Clark's savings and checking accounts.

Paico worked part-time for Clark, cleaning house and helping Clark run errands. Paico and Carapezza were neighbors in the same apartment complex and regularly used crack cocaine to-

gether. Paico gave Carapezza checks from Clark's account so that Carapezza could show them to her drug dealer as confirmation she had access to money which then allowed her to obtain drugs without paying for them. Carapezza proceeded to cash the checks on May 1, 2004.

Police interviewed Carapezza on May 6, 2004, about the checks she had cashed against Clark's account. Carapezza told police that Paico gave her the checks as payment for a debt that Paico owed her. Carapezza later pled guilty to two counts of forgery for cashing Clark's checks.

Police arrested Paico in Wichita on May 7, 2004. Paico admitted taking the checks from Clark's checkbook and admitted forging the check to S&S Oil and Propane. Paico also told police that she had seen a white male, a black male, and a white female at Clark's house on May 4, 2004. Paico identified the white female as Raven Briney. When the State offered Paico a deal in exchange for her testimony, she told police that the white female was actually Carapezza. According to Paico, she went to Clark's house to repay some of the money she had taken from Clark's account. When Paico knocked on the door and Clark did not respond, Paico looked in the front window and saw Carapezza and her boyfriend, Jason Hughes, standing over Clark, who was on her knees on the floor. Paico also saw a third person go into the kitchen. She identified the third person as Gail Bennett. Paico then went into Clark's house to find out what was going on and observed Hughes holding a hammer. Paico also saw blood on Clark's head.

According to Paico, Carapezza started crying and told Paico that Hughes and Bennett made her accompany them. While Paico was arguing with Carapezza and Hughes about what they were doing, Clark started to cry and crawl away. Hughes stepped toward Clark to hit her with a hammer, but Paico said she intercepted him and took the hammer. Carapezza tried to stop Clark from crawling away by jumping on her back. Paico hit Clark in the head with the hammer several times to make her lie still and stop screaming. Paico also shoved a glove into Clark's mouth to keep her quiet.

After struggling with Clark, Paico and Carapezza left in Paico's car while Hughes and Bennett remained at Clark's house. Paico

took Carapezza home and then drove to Clark's bank to check Clark's account balance as an alibi. Before returning to Clark's house, Paico went to Carapezza's apartment to pick her up. While driving back to Clark's house, Carapezza told Paico that Hughes and Bennett decided to rob Clark and made Carapezza go with them. Clark caught Carapezza, Hughes, and Bennett in the process of stealing things, and they hit her with a hammer to make her stop yelling so they could get away.

Upon returning to Clark's house, Paico saw Hughes sitting on Clark's front porch and Bennett jumping over the back fence. Clark was lying face down on the floor unconscious. Paico and Carapezza cleaned up some of the blood and began putting things in a trash bag. As they were loading the trash bag, Clark began moving and making noise, so Carapezza shoved the glove back in Clark's mouth. Paico, Carapezza, and Hughes then returned to their apartments, leaving Clark to die on her floor.

Police initially suspected Paico and they interviewed Carapezza several times during the month of May to get information about Paico. On July 21, 2004, the State gave Carapezza use and derivative-use immunity, and Carapezza provided inquisition testimony. On the same day, the State charged Paico with first-degree murder for Clark's death. Paico initiated plea negotiations with the State and agreed to testify against Carapezza, Hughes, and Bennett in exchange for a shorter prison term. For her part in Clark's murder, Paico pled guilty to one count of aggravated burglary and three counts of aiding a felon. Paico received a 60-month prison sentence.

After providing her inquisition testimony, Carapezza moved to Indiana, where she was arrested in September 2004, for Clark's murder. The State charged Carapezza with first-degree premeditated murder or, in the alternative, felony murder; aggravated burglary; aggravated robbery; and misdemeanor theft. The State's theory was that Carapezza and her codefendants robbed and killed Clark for money to fuel their crack cocaine habits. Although no physical evidence connected Carapezza with the crime scene, the State presented testimony from Paico and two of Carapezza's cellmates, who both testified that Carapezza admitted her participa-

tion in Clark's robbery and murder. The State also presented testimony from three of Carapezza's associates, who testified about Carapezza's addiction to crack cocaine. In order to establish Carapezza's drug addiction as the motive for Clark's murder, the State presented testimony from Dr. Eljorn Don Nelson, an expert on drug addiction, regarding the use of crack cocaine, the effects of using crack cocaine, and the behaviors associated with addiction to crack cocaine.

A jury found Carapezza guilty of felony murder, aggravated robbery, aggravated burglary, and misdemeanor theft. The district court sentenced Carapezza to serve life in prison for felony murder, 83 months for aggravated robbery, 34 months for aggravated burglary, and 12 months for misdemeanor theft. The district court ordered all of the felony sentences to be served consecutively, with the misdemeanor theft sentence to run concurrent with the felony sentences. Carapezza now appeals her convictions directly to this court pursuant to K.S.A. 22-3601(b)(1).

## ANALYSIS

### Drug Use as Res Gestae

Carapezza argues that the district court erroneously admitted evidence of her drug use and addiction. The district court admitted the evidence as res gestae, stating that it was part of an "overall scheme to obtain money for drugs."

The first step in considering a challenge to the admission of evidence is to determine whether the evidence is relevant. *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). All relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(f). Relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance is established by a material or logical connection between the asserted facts and the inference or result they are intended to establish. 282 Kan. at 47.

After relevance is established, the second step requires the application of the statutory rules governing the admission and exclusion of evidence. These rules are applied either as a matter of law or in the exercise of the district court's discretion, depending on

the rule in question. *Gunby* did not establish our standard of review for analyzing relevance—in particular, the probative element—of certain K.S.A. 60-455 evidence. As set forth in our recent decision in *State v. Reid*, 286 Kan. 494, Syl. ¶ 5, 186 P.3d 713 (2008), we concluded that our standard of review of "the probative element" of 60-455 evidence is abuse of discretion. In *Reid*, we clarified the analytical steps to be taken when considering 60-455 evidence and our standard of review applicable to each step.

"[T]he K.S.A. 60-455 analysis requires several steps. . . . [T]he court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in." [Citations omitted.] 286 Kan. at 503.

Res gestae is no longer accepted as a valid basis for independently admitting evidence. 282 Kan. at 63. The district court in the present case thus erroneously admitted the evidence of Carapezza's drug usage and addiction as res gestae without applying the analysis required by K.S.A. 60-455.

K.S.A. 60-455 provides:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Before the district court can admit evidence of another crime or civil wrong, it must determine whether the evidence is relevant to prove a disputed material fact and whether the probative value outweighs the prejudicial effect. 282 Kan. at 48, 57. The State argues that evidence of Carapezza's drug usage and addiction was relevant to establish motive. "Motive is the moving power which impels one to action for a definite result . . . . Motive is that which incites or stimulates a person to do an action." *State v. Jor-*

*dan*, 250 Kan. 180, 190, 825 P.2d 157 (1992) (quoting *State v. Ruebke*, 240 Kan. 493, 502, 731 P.2d 842, *cert. denied* 483 U.S. 1024 [1987]). According to the State's theory, Carapezza robbed Clark so she could purchase more crack cocaine to feed her addiction.

Carapezza argues to the contrary that the evidence was not relevant to establish a motive for the burglary and robbery because the motive is inherent in the commission of those crimes. Carapezza reasons that the motive was obviously financial gain, and it was irrelevant whether the stolen money was to be used to purchase drugs or to pay her overdue rent. In essence, Carapezza argues that a secondary motive is irrelevant when the primary motive is obvious.

This is an issue of first impression in Kansas. Although intent is an element of aggravated burglary and aggravated robbery, motive is not an element. Motive and intent are not the same thing. The State may nevertheless admit evidence of motive to explain why the defendant may have committed the crime or crimes at issue even though motive is not an element of the offense. *Ruebke*, 240 Kan. at 502-03 (allowing the admission of other-crimes evidence to explain that defendant committed murder to prevent witnesses from identifying him and causing his probation to be revoked). See also *Jordan*, 250 Kan. at 191 (admitting evidence of a prior crime to establish the defendant's motive for going to the apartment where he later committed murder). But see *State v. Tolson*, 274 Kan. 558, 565, 56 P.3d 279 (2002) (admitting evidence that defendant previously possessed drugs and guns to show knowledge and intent but concluding that the evidence was not admissible to show motive because it did not imply the defendant would use the gun to cause trouble).

The evidence of Carapezza's drug use is probative of the motive for robbing Clark. Carapezza's defense consisted of a general denial of guilt. Carapezza contended that she never met Clark and that Paico committed the crimes without Carapezza's assistance. Providing a motive for Carapezza's involvement establishes a material or logical connection to the inference that she participated in the crime. The evidence was therefore relevant to establish mo-

tive, regardless of whether it was the primary motive—money—or the secondary motive—buying drugs.

Several other courts have allowed evidence of drug usage or addiction to establish motive. See, *e.g.*, *United States v. Cody*, 498 F.3d 582, 590-91 (6th Cir. 2007) (admitting testimony from the defendant's wife and son regarding the family's drug use to establish the defendant's motive for robbing a bank); *State v. Armstrong*, 176 Ariz. 470, 473, 862 P.2d 230 (1993) (admitting a taped statement with defendant's admission to prior drug transactions because it was relevant to defendant's motive to traffic in stolen property); *Craft v. Stratton*, 2007 WL 3144855, at *11-12 (N.D. Cal. 2007) (unpublished opinion) (admitting evidence of defendant's drug use to establish defendant's motive for robbing and killing victim); *State v. Jarrett*, 137 N.C. App. 256, 261, 527 S.E.2d 693 (2000) (allowing prosecutor to characterize defendant as a "crack head" because prosecutor was free to argue defendant had robbed and shot the victim to obtain money for drugs); *People v. Wood*, 245 App. Div. 2d 200, 666 N.Y.S.2d 599 (1997) (admitting testimony of defendant's drug addiction to establish defendant's motive for robbing his mother and the mother's reason for testifying against her son); *Washington v. State*, 2007 WL 1412903, at *3 (Tex. App. 2007) (unpublished opinion) (admitting evidence that defendant traded a stolen van for crack cocaine because it made the fact or consequence that defendant committed aggravated robbery more probable by providing motive). But see *State v. Boman*, 123 Idaho 947, 950-51, 854 P.2d 290 (Idaho App. 1993) (holding that bare allegation that defendant's drug addiction was relevant to prove motive was nothing more than speculation, but affirming defendant's conviction because the error in admitting the evidence was harmless). Here, the trial court did not abuse its discretion in finding that Carapezza's drug use was relevant.

After determining relevance, we must consider whether the probative value of the evidence outweighs its prejudicial effect. *Gunby*, 282 Kan. at 48, 57. This part of the evidentiary analysis is also reviewed for abuse of discretion. *Reid*, 286 Kan. 494, Syl. ¶ 8; *Garcia*, 285 Kan. at 18 (citing *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 [2004]). The burden of proof is on the party alleging

that discretion is abused. *Reid*, 286 Kan. 494, Syl. ¶ 9; *Garcia*, 285 Kan. at 18-19.

The evidence of Carapezza's drug use may have been damaging in the minds of the jurors, and other evidence exists that she had a motive to commit robbery for financial reasons unrelated to purchasing drugs. However, as previously noted, there is sufficient evidence in the record to establish a nexus between the financial motive and the necessity to purchase the drugs to fuel her addiction. Further, Carapezza's drug use was obvious and referenced throughout the trial. Paico testified without objection that she and Carapezza used crack "[p]retty much every day." Paico further testified that she had given Carapezza checks from Clark's checkbook because Carapezza was high and agitated. According to Paico, Carapezza said she was going to show the checks to her drug dealer in order to scam the dealer and obtain drugs without paying for them. Paico also testified that she and Carapezza and several other people were using crack throughout the weekend before Clark was murdered. Paico testified that Carapezza was high when Paico saw her at Clark's house. Besides failing to object to Paico's testimony, Carapezza failed to object when one of the detectives testified that he had often spoken with Carapezza about the drug business occurring at Carapezza's apartment complex. The detective also testified without objection that he thought Carapezza was addicted to crack cocaine and that another known crack user had informed him that Carapezza would do anything to obtain crack cocaine. In weighing whether the probative value of the admission of drug evidence outweighs its prejudicial effect, Carapezza has not shown that the trial court abused its discretion in admitting the testimony.

For the last step of the 60-455 analysis, we address the absence of a limiting instruction in this case under the clearly erroneous standard. Not including a limiting instruction informing the jury that it could only consider Carapezza's drug use to the extent it was probative of motive was error. However, as we just discussed, her drug use was obvious and referenced throughout the trial. As a result, we are not able to declare a real possibility existed that the jury would have returned a different verdict if the trial error had not occurred.

### Evidence of Prior Unrelated Forgeries

Carapezza argues that the district court erred when it admitted evidence that she attempted to cash checks against Tom McBride's closed checking account. The district court concluded that the evidence was relevant to establish her motive and plan. She objected to the testimony relating to the checks based on hearsay but failed to object to the evidence pursuant to K.S.A. 60-455. A party must make a timely and specific objection in order to preserve for appeal an issue relating to the admissibility of evidence. K.S.A. 60-404; *State v. Francis*, 282 Kan. 120, 138, 145 P.3d 48 (2006) (defendant precluded from raising issue regarding admission of evidence pursuant to K.S.A. 60-455 because defendant failed to object to evidence at trial). Carapezza failed to preserve this issue for appeal.

### Expert Testimony

Carapezza next argues that the district court erred when it allowed the State to present testimony from an expert regarding the behaviors of people addicted to crack cocaine. The State presented testimony from Dr. Eljorn Don Nelson, a professor of clinical pharmacology and cell biophysics at the University of Cincinnati College of Medicine, an associate director of the Drug and Poison Information Center, and a career teacher in the Addictions Fellowship at the National Institute of Drug Abuse.

Dr. Nelson testified about the method of consuming crack cocaine and about the chemical differences between crack cocaine and cocaine. Noting that crack has a slightly faster impact on the body than cocaine, Dr. Nelson testified that the pharmacology of crack is similar to that of cocaine in that both drugs create a short-term euphoric response caused by the release of dopamine followed by a stimulation of the fight-or-flight response, which tends to make users more paranoid, hostile and aggressive. According to Dr. Nelson, people who use crack become addicted to the euphoric response after their first usage. Because the euphoric response is fairly short, users may smoke crack for several days at a time before becoming completely exhausted, irritable, nervous, and anxious. In order to relieve their nervousness and anxiety, many users take sedatives and crash, sleeping for long periods of time. Dr. Nelson

testified that very few people use crack casually. Most people either become addicted to crack or stop using it altogether. For those who become addicted, crack becomes the highest priority in their lives, and obtaining crack becomes an overwhelming preoccupation. Dr. Nelson described the addiction as follows:

"People will obtain or buy crack and they will use it until it's gone. And in the middle of their use then they are constitutionally incapable of stopping using the drug until the drug is used up. So, they have uncontrolled use and they have continued use despite negative consequences. Bad things start to happen. Blood pressure goes up, they have chest pains, they have fights with other people, they get involved in activities that are illegal as a result of their obtaining crack cocaine. These are negative things that happen, but these negative things that happen don't stop them from continued use."

Carapezza raises three arguments in support of her claim that the district court erred in admitting Dr. Nelson's testimony. She first argues that the expert testimony was unnecessary to aid the jury's understanding of crack cocaine use. She next argues that the evidence was irrelevant except to show criminal propensity. Finally, she argues that any probative value was outweighed by the prejudicial effect of the evidence.

The first question in determining the admissibility of evidence is relevance. If the evidence is relevant to a material fact, it may be admitted in accordance with the rules of evidence. This court reviews the admission of expert testimony pursuant to K.S.A. 60-456 under an abuse of discretion standard. *State v. Oliver*, 280 Kan. 681, 693-94, 124 P.3d 493 (2005).

In *State v. Clements*, 244 Kan. 411, 770 P.2d 447 (1989), the defendant was charged with aggravated criminal sodomy. The State elicited testimony from an expert, who described the typical characteristics of individuals who sexually abuse children and created the inference that the defendant fit the profile of a pedophile. In closing argument, the prosecutor tied to the defendant the expert witness' general profile of sexual offenders. The *Clements* court reversed the defendant's conviction, concluding that the expert's testimony was not relevant because it did not assist the jury in determining whether the child was sexually abused by the defendant. 244 Kan. at 421. See also *State v. Price*, 30 Kan. App. 2d 569,

581, 43 P.3d 870 ( 2002) (defendant could not present expert testimony of characteristics of sex offenders to show he did not share those characteristics, because the evidence was not relevant).

In *State v. Cheeks*, 253 Kan. 93, 853 P.2d 655 (1993), the defendant was charged with felony murder based on child abuse. The State presented evidence from a child abuse expert, who described crying and defecating or urinating as the two most common behaviors that precipitate child abuse. The expert then tied these typical behaviors to the defendant and the victim. The *Cheeks* court held that the expert's testimony was not relevant to determine whether the defendant committed felony murder. The *Cheeks* court noted that the inference from the expert's testimony was that, because the 16-month-old victim cried and defecated on the day she died, the defendant must have killed her. Concluding that the inference was impermissible, the *Cheeks* court held that the district court abused its discretion in admitting the evidence and reversed the defendant's conviction. 253 Kan. at 102-03.

*Clements* and *Cheeks* stand for the proposition that behavioral profile evidence is not admissible to imply guilt by showing that the defendant falls within the profile. This court arrived at a different result, however, in *State v. Tran*, 252 Kan. 494, 847 P.2d 680 (1993), where it concluded that the district court properly admitted expert testimony regarding the typical behavior of gang members to establish the defendant's motive for committing murder. The State's theory was that the defendant shot the victim to avenge an injury to a fellow gang member. To demonstrate this theory, the State's expert on gang behavior testified that Asian gangs are likely to retaliate and that the means of retaliation could include violence. Distinguishing *Clements*, the *Tran* court concluded that the evidence was helpful to the jury and relevant to explaining the defendant's actions. 252 Kan. at 502. The *Tran* court analogized the admission of gang evidence for the purpose of showing motive to the admission of gang evidence for the purpose of showing bias. 252 Kan. at 505. See also *State v. Toney*, 253 Kan. 651, 862 P.2d 350 (1993) (allowing expert testimony regarding gang profiles to establish motive). But see *State v. Cox*, 258 Kan. 557, 908 P.2d 603 (1995) (expert testimony regarding gang profiles

was error because no evidence suggesting gang involvement or gang motivation).

The expert testimony at issue in this case is more analogous to the profile testimony in *Clements* and *Cheeks* than to the testimony allowed in *Tran*. Like the evidence in *Clements* and *Cheeks*, Dr. Nelson's testimony did not help the jury determine whether Carapezza burglarized Clark's house and robbed and killed her. The only inference from Dr. Nelson's testimony is that crack addicts will do anything to obtain the drug, so Carapezza must have committed the crimes because she is a crack addict. Like the inference in *Cheeks*, this inference is impermissible. The district court abused its discretion in admitting Dr. Nelson's testimony.

This court has considered harmless-error analysis in other cases involving the admission of expert testimony. See, *e.g. State v. Mullins*, 267 Kan. 84, 97, 977 P.2d 931 (1999) (admission of expert's testimony regarding whether the victim had been coached was error but error was harmless); *Cox*, 267 Kan. 557 (admission of expert testimony regarding gang profiles was harmless error). K.S.A. 60-261 requires the court to find the erroneous admission of evidence to be harmless error unless the error affects the defendant's substantial rights.

In the present case, no physical evidence linked Carapezza to the crime scene. The State's principal evidence against Carapezza came from Paico, a codefendant whose credibility was questionable due to discrepancies between her prior statements and her trial testimony and due to her favorable plea agreement, which limited her sentence to 60 months if she testified against Carapezza and her other codefendants. The only other evidence linking Carapezza to the crimes came from jailhouse informants, who testified that Carapezza admitted participating in the crimes. The State's theory was that Carapezza was a crack cocaine addict, willing to rob and kill Clark to get more drugs. Dr. Nelson's testimony simply provided an expert's opinion about propensity in order to bolster the State's theory. That evidence was highly prejudicial, especially when combined with the evidence that Carapezza was addicted to crack. This court cannot conclude that the error did not affect Carapezza's substantial rights.

Because the expert testimony relating to the propensity of cocaine addicts to commit violent crimes was not relevant and because it undermined Carapezza's right to a fair trial, her convictions must be reversed.

### Derivative-Use Immunity

Shortly after Clark's death, Carapezza appeared at an inquisition into the murder. She received use and derivative-use immunity for her testimony. She argues on appeal that the State violated her Fifth Amendment right against self-incrimination by using her immunized inquisition testimony against her. Although the State did not attempt to admit any of Carapezza's inquisition testimony during the trial, she argues that the State used her inquisition testimony in violation of her grant of immunity to further its investigation and to prepare for trial and plan its trial strategy.

Carapezza objected to the use of her immunized inquisition testimony before trial, and the district court held a hearing to determine whether the State had violated her rights. After hearing evidence from two police officers and Paico's attorney, the district court concluded that no evidence was offered during Carapezza's inquisition that had not otherwise been obtained from her own statements to law enforcement officers prior to her inquisition. In addition, the district court found that no additional witnesses were made known to the police as a result of Carapezza's inquisition testimony.

In order to establish that its evidence is not tainted by the use of a defendant's immunized testimony, the State has the burden of proving it had a legitimate, independent source for the disputed evidence. The burden of proof on the State is an affirmative duty to prove that the evidence it plans to use is derived from "a legitimate source wholly independent of the compelled testimony." *Kastigar v. United States*, 406 U.S. 441, 460, 32 L. Ed. 2d 212, 92 S. Ct. 1653 (1972). A by-product of the Fifth Amendment is that *Kastigar* may require a trial within a trial—or a trial before, during, or after the trial—if such a proceeding is necessary for the court to determine whether the State has in any fashion used compelled

testimony to indict or convict a defendant. See *United States v. North*, 910 F.2d 843, 861 (D.C. Cir. 1990).

When asked to review the violation of a defendant's Fifth Amendment right against self-incrimination, this court reviews the district court's factual findings using a substantial competent evidence standard, but the ultimate legal conclusion is reviewed as a question of law using an unlimited standard of review. *State v. Bell*, 280 Kan. 358, 362, 121 P.3d 972 (2005).

Because this court is remanding the case for new trial, it serves little purpose to reexamine the State's evidence presented in the first trial to determine whether it was the product of immunized testimony. The district court is directed to conduct a renewed hearing or hearings with respect to the use of such testimony. At any such hearing, the burden will be on the State to demonstrate that no part of its case was or will be derived from the immunized testimony.

In conducting this hearing, the district court is to be mindful of certain principles. "[Use immunity] prohibits the prosecutorial authorities from using the compelled testimony in *any* respect." *Kastigar*, 406 U.S. at 453. At the hearing, the State must demonstrate that it obtained all of the evidence it proposes to use from sources independent of the compelled testimony. See *North*, 910 F.2d at 854. The district court must make specific findings on the independent nature of the proposed evidence. 910 F.2d at 855-56. No use at all may be made of the immunized testimony. 910 F.2d at 862. The fact that other witnesses were exposed to immunized testimony may suffice to taint their testimony. See 910 F.2d at 863-64.

Although such tight restrictions on the use of immunized testimony may jeopardize the State's case, this court notes the caveat of the Ninth Circuit Court of Appeals in recommending caution in conducting immunized hearings:

"The government must occasionally decide which it values more: immunization (perhaps to discharge institutional duties, such as congressional fact-finding and information-dissemination) or prosecution. If the government chooses immunization, then it must understand that the Fifth Amendment and *Kastigar* mean

that it is taking a great chance that the witness cannot constitutionally be indicted or prosecuted." 910 F.2d at 862.

### Cumulative Errors

Carapezza submits as a final issue that the trial errors, even if found to be harmless in isolation, combine to constitute prejudicial error. Because this court is reversing the convictions based on improper expert testimony, it will not need to determine whether the errors cumulatively amounted to reversible error.

### Conclusion

We reverse the convictions and remand for a new trial. Such a trial is to be conducted without expert testimony pertaining to the propensity of cocaine users to commit crimes. The district court is to conduct a hearing or hearings to determine whether testimony proffered or introduced by the State violates the Fifth Amendment prohibition against self-incrimination.

LUCKERT, J., concurring in part and dissenting in part: I respectfully disagree with the majority's conclusion that the erroneous admission of Dr. Nelson's expert testimony requires the reversal of Carapezza's convictions. In all other respects, I agree with the majority opinion, including the conclusion that the profiling testimony of the expert witness was inadmissible.

The majority, in concluding Carapezza's convictions should be reversed, opined that Carapezza's substantial rights were violated by the admission of Dr. Nelson's testimony. See K.S.A. 60-261 (harmless error rule; no error in admission of evidence is ground for disturbing judgment "unless refusal to take such action appears to the court inconsistent with substantial justice"). This opinion was largely based upon the majority's perception that the evidence against Carapezza was relatively weak.

In reaching this conclusion, the majority noted that there was no physical evidence linking Carapezza to the crime scene. While this is true, there was physical evidence linking her to the course of conduct of stealing money from the victim. Just 4 days before the murder, Carapezza cashed forged checks. This course of conduct corroborated codefendant Mollie Paico's version of the facts. Additionally, Paico's testimony implicated Carapezza, and two of

Carapezza's cellmates testified she had confessed her guilt. In my view, this evidence is sufficient for a jury to find beyond a reasonable doubt that Carapezza was guilty.

In addition, the majority noted that Dr. Nelson's testimony regarding crack cocaine was prejudicial. Yet, the record is replete with evidence regarding drugs and drug use, much of it admitted without objection. Given the pervasive theme of drugs throughout the trial, it seems very questionable that the expert testimony was so prejudicial as to violate substantial rights. In fact, Carapezza's own arguments suggest she does not perceive that Dr. Nelson's testimony added to information otherwise available to the jury. Rather, she argues Dr. Nelson's testimony should have been excluded because his opinion was unnecessary to aid the jury's understanding of crack cocaine. In other words, while Dr. Nelson's testimony added scientific insight into why crack impacts users, much of his testimony related to matters within the common knowledge of a juror.

I agree with Carapezza's argument that Dr. Nelson's expert testimony added little to the understanding of the case. And, while his testimony made little difference, the evidence against Carapezza, while not overwhelming, was strong. Therefore, I would conclude that the admission of his testimony did not deny Carapezza substantial justice. The standard of K.S.A. 60-261, stating that a new trial shall not be granted on the basis of the erroneous admission of evidence unless the error affects the substantial rights of the parties, is not met.

MCFARLAND, C.J., and NUSS, J., join in the foregoing concurring and dissenting opinion.