NOT DESIGNATED FOR PUBLICATION

No. 118,495

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ROBIN D. KNIGHT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN J. O'CONNOR, judge. Opinion filed January 11, 2019. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., ATCHESON and POWELL, JJ.

GARDNER, J.: Robin D. Knight was convicted by a jury of crimes including two counts of attempted second-degree murder—one count alleged Tyrel Saunders as the intended victim and one count alleged Nathaniel Saunders as the intended victim. Knight's appeal contends the jury lacked sufficient evidence to convict him of the attempted second-degree murder of Nathaniel Saunders. We admit this issue presents a close call, but finding sufficient evidence of intent we affirm.

1

*Factual and procedural background*

Before 2015, Knight was friends with Tyrel Saunders. They had lived in the same neighborhood for about 10 years and had visited each other's houses numerous times. That friendship seemingly ended by 2015, when Tyrel testified against Knight in court. Nathaniel Saunders, Tyrel's younger brother, went with Tyrel to court when he testified against Knight again in 2016.

About one month after Tyrel testified against Knight in 2016, Tyrel and Nathaniel were jogging on Old Manor Road near their home. They had just left their house heading north on Old Manor. Tyrel was on the west side of the street and Nathaniel was on the east side. Cheryl Holloway, a neighbor, saw them jogging on Old Manor.

At about the same time, Darius Sheeley was driving through the neighborhood in a gold Pontiac. Knight was in the passenger's seat and Knight's younger brother, Antonio Knight, was in the back seat. The three were headed to Sheeley's house to smoke marijuana.

When Knight saw Tyrel and Nathaniel he spontaneously exclaimed, "These bitch ass niggers." Sheeley testified that immediately after making that statement Knight started to jump out of his moving car and began shooting.

Tyrel testified that Sheeley drove the car between Tyrel and Nathaniel, stopped, rolled down the window, and said, "I heard you been snitching." Tyrel did not know Sheeley, but looked into the car and recognized Knight and Antonio. Tyrel responded to the snitch comment by saying, "What's up," and stepping back from the car. He believed Knight wanted to fight. Nathaniel came around the rear of the car to the driver's side of

2

the car to see what was happening. Nathaniel saw the driver, recognized him from school events, and knew that Sheeley had been associating with Knight.

Tyrel testified that Knight replied by saying, "What's up," pointing a gun at him, then moving to get out of the car on the passenger's side. Fearing for his safety, Tyrel immediately took off running south. Nathaniel recognized something was wrong when Tyrel began to run, so Nathaniel also turned and ran south. Knight got out of the car and rapidly fired seven shots southward. As they ran, the Saunders brothers split up—Tyrel ran on the west side of the street and Nathaniel ran on the east. Tyrel saw a bullet hit a puddle of water near him and heard at least one bullet whiz past his head. One bullet hit the side mirror on a blue Suzuki parked on the west side of Old Manor. Nathaniel heard the gun firing and continued running, in fear of his life. Neither Tyrel nor Nathaniel looked back to see who was shooting at them.

Tyrel and Nathaniel ran past Holloway's house again headed south. Holloway recalled hearing the shots and seeing Tyrel and Nathaniel running south about 20 or 30 seconds after they first passed by her house jogging north. Tyrel and Nathaniel ran to their nearby house, retrieved car keys, and immediately left in Nathaniel's car because they feared for their safety. They drove a few blocks to find their mother at work and told her what had just happened. Although Tyrel and Nathaniel were hesitant to call the police, their mother insisted on calling 911. She called 911 and reported: "Hi, . . . my name is Patricia Saunders and my sons just came up to my job to let me know that someone just shot at them." Tyrel stayed with his mother, but Nathaniel left because he did not want to talk to the police.

Over the next several hours, police conducted an investigation. They found five shell casings on Old Manor and found the gold Pontiac in a nearby driveway. Inside the car, police found two more shell casings and a driver's license belonging to Sheeley. Police quickly learned who the suspects were and located them for questioning.

The State charged Knight with two counts of attempted first-degree murder, two counts of aggravated assault, one count of criminal damage to property, one count of criminal possession of a weapon by a convicted felon, and one count of unlawful discharge of a firearm in a city.

At Knight's jury trial, the State presented evidence including the testimony of Tyrel, Nathaniel, and Sheeley, who had entered a plea bargain. The State also introduced testimony and the 911 recording of Patricia Saunders, testimony from several officers and crime scene investigators, photographs and maps of the scene and car, and the shell casings from the street and the car.

The jury convicted Knight of two counts of attempted second-degree murder (a lesser included crime of the first-degree murder charges), two counts of aggravated assault, one count of criminal damage to property, and one count of criminal possession of a weapon by a convicted felon. The district court granted a motion for judgment of acquittal on the count of unlawful discharge of a firearm in a city.

*The State presented sufficient evidence to convict Knight of the attempted second-degree murder of Nathaniel Saunders.*

On appeal, Knight raises only one issue—whether the State presented sufficient evidence to convict him of the attempted intentional second-degree murder of Nathaniel Saunders. Due process requires the prosecution to prove all essential elements of the crime. *In re Winship*, 397 U.S. 358, 361-64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

Our standard of review requires us to view the evidence in a light most favorable to the prosecution.

"'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the

4

prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

Second-degree murder, as relevant here, is defined as "the killing of a human being committed: (1) Intentionally." K.S.A. 2017 Supp. 21-5403(a). An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof." K.S.A. 2017 Supp. 21-5301(a). "Attempt requires specific intent to commit the object crime." *State v. Louis*, 305 Kan. 453, 461, 384 P.3d 1 (2016). "A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result." K.S.A. 2017 Supp. 21-5202(h). The district court instructed the jury accordingly, requiring the State to prove that Knight committed an overt act with the conscious object or desire to kill Nathaniel.

"Intent is difficult, if not impossible, to show by definite and substantive proof. Thus, it is agreed that criminal intent may be shown by proof of the acts and conduct of the accused, and inferences reasonably drawn therefrom." *State v. Woods*, 222 Kan. 179, 185, 563 P.2d 1061 (1977). In making those inferences, the jury presumes that a person intends all the natural consequences of his acts. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Intent can be, and usually is, inferred from circumstantial evidence. *State v. Thach*, 305 Kan. 72, 83-84, 378 P.3d 522 (2016). Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). A conviction of even the gravest offense can be based entirely on circumstantial evidence. 304 Kan. at 25. It is the jury's prerogative to

5

determine the weight to give the evidence and the reasonable inferences to be drawn therefrom. *State v. Gibson*, 246 Kan. 298, 303, 787 P.2d 1176 (1990).

The State's proof of motive may play a large part in proving intent:

> "Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case. Motive makes some sense out of what otherwise appear to be completely senseless crimes." *State v. Engelhardt*, 280 Kan. 113, 128, 119 P.3d 1148 (2005).

An inference of an intent to kill may be based on evidence that shots were fired in the direction of the path a victim used to flee from the defendant and evidence of the trajectory of bullets recovered in the area. See *State v. Childers*, 222 Kan. 32, 37, 563 P.2d 999 (1977).

The circumstantial evidence here supports the reasonable inference that Knight intended to kill Nathaniel. We focus on five pieces of evidence, although the record could contain more. First, the State presented a motive for Knight to kill Nathaniel—Nathaniel had accompanied Tyrel, his brother, to court when Tyrel testified against Knight. Nathaniel's presence with Tyrel in court could reasonably be inferred as a show of support for Tyrel's testimony. That testimony had occurred just a month before the shooting—a relatively short period of time. And Knight had not seen the Saunders brothers after Tyrel's testimony against him until the shooting, except at a graduation. It is reasonable to infer that many people were present at a graduation ceremony—enough people to deter Knight from taking revenge there. The jury could reasonably infer that Knight's first good opportunity to get revenge on Tyrel and Nathaniel was when he saw them jogging on Old Manor.

6

Second, it was uncontradicted that when Knight first saw the Saunders brothers jogging down the street, he spewed an abusive epithet about *both* Nathaniel and Tyrel, exclaiming, "These bitch ass niggers." This virulent statement shows that his animus was not limited to Tyrel, but included Nathaniel as well. Knight apparently felt the same way about both brothers.

Third, within a few seconds after uttering his repulsive epithet about Nathaniel and Tyrel, Knight had pulled a gun, jumped out of the car, and began shooting south, in the direction where both Tyrel and Nathaniel had begun to run. The entire episode, from when Tyrel and Nathaniel were jogging north to when they ran south, took only 20 or 30 seconds. Although opprobrious name-calling does not alone evidence an intent to kill, Knight's scurrilous statement was made in such close proximity to his shooting that it should be considered indicative of that intent.

Fourth, it is reasonable to infer that both Nathaniel and Tyrel were in the line of fire. Both had approached the driver's side of the car immediately before Knight got out of the passenger's side and started shooting. Tyrel's testimony that he was at the driver's door, and Nathaniel's testimony that he had gone around the back of the car to the west side of the street, where he identified the driver, shows that Tyrel and Nathaniel were in close proximity to each other when Knight began firing the gun. Although they split up while running south, both ran in the street and thus could not have split too far in either direction. As the State's exhibits show, cars were parked on both sides of the two-way street, narrowing the route in which the Saunders brothers could flee and forcing them away from the curbs and toward its middle. Parked directly across the street from the car whose side window Knight shot was another car, meaning that Tyrel and Nathaniel could not have been far apart when Knight was shooting at them.

The State's theory may be described as a concurrent intent theory—even if the jury found that Knight primarily wanted to kill Tyrel rather than Nathaniel, it could

7

reasonably also have found a *concurrent* intent to kill Nathaniel, based on his expressed animus toward both of them immediately preceding his rapid-firing toward the two who were in close proximity to each other. See *People v. Bland*, 28 Cal. 4th 313, 331, 48 P.3d 1107, 121 Cal. Rptr. 2d 546 (2002) (upholding attempted murder convictions as to the passengers although evidence may have shown that defendant primarily wanted to kill the driver rather than the passengers—jury could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone). Although Kansas cases have not addressed the concurrent intent theory, nothing about it requires any special treatment. "This concurrent intent theory is not a legal doctrine requiring special jury instructions such as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." 28 Cal. 4th at 331, n.6. Thus Knight's primary intent to kill Tyrel does not rule out a concurrent intent to kill Nathaniel. Based on the circumstances, that is a reasonable inference the jury may draw here.

Fifth, Tyrel and Nathaniel perceived that Knight was shooting at both of them and told others so. Immediately after the shooting, they went to find their mother and told her what had happened. She called 911 and reported that someone had just shot at her sons. Similarly, when Tyrel spoke to the police officer who responded, Tyrel told him that Knight had "opened fire on him and his brother." The officer understood that "both Tyrel and his brother, Nathaniel, had been shot at." The driver, Sheeley, testified that as they passed Tyrel and Nathaniel, Knight said, "These bitch ass niggers," and started to get out of the moving car. He then pulled a gun from his waistband and started shooting "[b]ack towards the dudes." And Nathaniel testified that he thought he was going to get killed that day—he thought he was going to be hit in the back or the back of his head and thought Knight was aiming towards his back.

8

Last, but not least, this very argument was presented to and rejected by the jury. Defense counsel argued to the jury during closing arguments that no evidence showed Knight intended to kill Nathaniel. The jury heard that argument, considered the evidence, then chose to convict Knight of attempted second-degree murder of Nathaniel, basing their contrary conclusion on reasonable inferences drawn from the evidence including that summarized above.

The evidence could, of course, support the conclusion that Knight intended to kill only Tyrel. But the State presented sufficient evidence, including Knight's motive to kill Nathaniel, Knight's hateful speech, the closeness in time between that speech and the shooting, the physical proximity of the two brothers as they fled in the kill zone, and the impressions of the intended victims, which, if viewed in the light most favorable to the prosecution, could lead a rational fact-finder to conclude that Knight intended to kill both Nathaniel and Tyrel. The reason we have juries in the first place is to sort out this kind of messy, conflicting evidence. See *State v. Bellinger*, 47 Kan. App. 2d 776, 807, 278 P.3d 975 (2012) (Atcheson, J., dissenting). The jury did so here. The circumstances shown by the record permit a reasonable inference that Knight intended to kill Nathaniel. No more is required.

Affirmed.

* * *

ATCHESON, J., dissenting:  As with all human endeavors, jury trials are imperfect. So, within defined limits, judges have the authority to undo erroneous verdicts. And they perform one of their most critical duties when they find a jury has convicted a criminal defendant without sufficient evidence. But judges, as human beings routinely asked to solve difficult legal puzzles, also err from time to time.

9

I respectfully dissent from the majority's decision to affirm the conviction of Defendant Robin D. Knight for the attempted second-degree murder of Nathaniel Saunders. There was plenty of evidence to support the jury's verdicts convicting Knight for the attempted second-degree murder of Tyrel Saunders, Nathaniel's brother; the aggravated assault of both brothers; and a weapons violation—so much that Knight doesn't challenge those convictions on appeal. But the State produced insufficient evidence to show Knight intended to kill Nathaniel—so little that the prosecutors never explained in closing argument to the jurors why they should reach that conclusion.

This case, then, illustrates at least one of the realities of the judicial process. All of the judges reviewing the verdict convicting Knight of attempting to murder Nathaniel Saunders can't be right. And, in my view, it also illustrates the other reality. The jurors, despite their diligent efforts, were fallible in reaching that verdict.

The standard for setting aside a jury verdict in a criminal case for insufficient evidence is a stringent one, as it should be. The evidence must be viewed in the light most favorable to the State, as the prevailing party. A reviewing appellate court cannot reweigh disputed evidence and, thus, must credit any conflicts in testimony to the State's advantage. *State v. Jenkins*, 308 Kan. 545, Syl. ¶ 1, 422 P.3d 72 (2018). A judicial finding of insufficient evidence requires a stern result: The court must acquit the defendant of the charge. See *State v. Scott*, 285 Kan. 366, Syl. ¶ 2, 171 P.3d 639 (2007) (judgment of acquittal proper relief on appeal when trial evidence legally insufficient to convict); *State v. Herrman*, 33 Kan. App. 2d 46, 50, 99 P.3d 632 (2004) (reversing conviction on appeal when facts stipulated in bench trial insufficient to support charge). I offer those standards not as mere recitation but to indicate that I have reflected upon them in analyzing this appeal.

The critical evidence here is remarkably contained. The incident during which Knight brandished and then fired his pistol took place on a residential street in Wichita on a drizzly May afternoon in 2016. The encounter lasted no more than a minute or two. The jurors, sitting in Sedgwick County District Court, heard the evidence during a trial about seven months later. Three witnesses testified to what happened. Each of the Saunders brothers gave his account. Darius Sheeley, the driver of the car in which Knight was riding, testified under the terms of a plea deal with the State. Knight did not testify in his own defense, and the State offered no statements he made to third persons about what happened. Knight's brother Antonio was in the back seat of the car. The jurors did not hear his version of the events.

The State had charged (and the jurors rejected) attempted premeditated first-degree murder as to each Saunders brother. Pertinent here, the jurors convicted Knight of the lesser included offense of attempted intentional second-degree of murder of Nathaniel Saunders. To convict Knight, the jurors were instructed they had to find beyond a reasonable doubt that he intended to kill Nathaniel, took an "overt act" toward killing Nathaniel, and failed in that effort. See K.S.A. 2017 Supp. 21-5403(a)(1) (defining intentional second-degree murder); K.S.A. 2017 Supp. 21-5301(a) (defining attempt to commit crime); K.S.A. 2017 Supp. 21-5202(h) (defining acting intentionally or with intent). The mental state or mens rea for the attempted murder required Knight to have the idea or purpose to kill Nathaniel. And to establish an attempt, Knight had to take a "step in a direct movement towards completing the crime"—conduct amounting to more than "mere preparation" to kill Nathaniel. *State v. Martinez*, 290 Kan. 992, 1003-04, 236 P.3d 481 (2010); see K.S.A. 2017 Supp. 21-5301(a) (attempt requires "overt act" to carry out a crime by "person who intends to commit such crime" but fails in doing so); *State v. Louis*, 305 Kan. 453, 460-61, 384 P.3d 1 (2016). The jury instructions defined "overt act" in substantially those terms.

11

The accounts from the Saunders brothers and Sheeley reflect their differing vantage points of the encounter. But the descriptions do not materially conflict as to the essential components. In short, the evidence was for all practical purposes undisputed. The real question was what that evidence added up to as a legal matter given the charges Knight faced.

The jurors knew that Nathaniel and Tyrel Saunders were jogging as a conditioning exercise in anticipation of football practice later in the summer. They were running on opposite sides of the street when Sheeley pulled up in his car. Tyrel approached the car on the driver's side when Knight pointed the pistol at him from the front passenger's seat. Tyrel turned and began running. Nathaniel, who had come around the back of the car, also ran when he saw his brother in flight. The two may have been close to each other for an instant, but they ran from the car as they had been jogging—on opposite sides of the street. Both Saunders brothers testified they were on opposite sides of the street when they heard the first shot, and the rest of the shots came in rapid succession.

Based on the shell casings police recovered, Knight fired seven shots. Tyrel testified that he heard a bullet "whoosh" by his head, and he saw a bullet splash in a puddle near him. The police determined one of the bullets struck the exterior mirror of a car parked on the side of the street Tyrel used as he fled. There was no comparable physical evidence or testimony to suggest Knight directed any of the shots at Nathaniel. Nathaniel never saw the handgun. He heard the shots and reasonably feared he might get hit. But he did not perceive any of the bullets as having passed in his direction.

Sheeley testified that he saw Knight step out of the car on the passenger's side and fire his pistol. Asked by a prosecutor where Knight's hand was pointed as he fired, Sheeley testified, "His hand was pointed towards *the dude* that was behind my car." Sheeley then agreed that Knight fired none of the shots in the air or into the ground. The testimony may be ambiguous as to who specifically Knight was shooting at, since both

Tyrel and Nathaniel were, in general terms, behind Sheeley's car as they fled. But Sheeley unambiguously stated Knight was shooting at only one of the Saunders brothers—his target was "the dude," not both dudes or first one dude and then the other dude. There was no contradictory evidence. Sheeley never said Knight shifted his aim or the pistol from one brother to the other. And the accounts from the Saunders brothers are consistent with Knight shooting only at Tyrel. As I discuss shortly, no circumstantial evidence supports a different conclusion.

The jurors, then, had to rely on speculation and ungrounded inferences to reach the conclusion they did as to the attempted murder charge with Nathaniel as the victim. That's not good enough. We don't convict people of crimes based on speculation. See *State v. Williams*, 229 Kan. 646, 663-64, 630 P.2d 694 (1981) (conviction may not rest on speculation and conjecture); *State v. Perez-Rivera*, 41 Kan. App. 2d 579, 582, 203 P.3d 735 (2009). The evidence amply supports Knight's conviction for the attempted murder of Tyrel and the aggravated assault of both Saunders brothers. Knight committed an aggravated assault of Tyrel when he pointed the pistol at Tyrel while still seated in Sheeley's car. He committed an aggravated assault of Nathaniel as he shot at Tyrel. See K.S.A. 2017 Supp. 21-5412(b)(1) (aggravated assault entails using a deadly weapon to place "another person in reasonable apprehension of immediate bodily harm").

Knight's alleged intent to kill Nathaniel emerges as the dispositive issue. The jurors had no direct evidence of that intent, such as a statement from Knight about who he wanted to shoot. But criminals commonly do not so patently telegraph what's on their mind. The State may establish intent through "inferences reasonably deducible" from the proved circumstances. *State v. Griffin*, 279 Kan. 634, 638, 112 P.3d 862 (2005); see *State v. Thach*, 305 Kan. 72, 82, 378 P.3d 522 (2016) (circumstantial evidence of intent commonly to be expected, and juries "have historically used" such evidence in criminal cases to find requisite bad intent). The majority cites five evidentiary considerations that purport to support Knight's intent to kill Nathaniel. I examine those to show the lack of

13

actual evidence bearing on the required intent. And the majority then misappropriates an observation of mine about the singular role jurors occupy in resolving credibility disputes in criminal cases. I explain why that observation isn't pertinent here. My exercise, thus, reveals the insufficiency of the evidence to convict Knight for the attempted second-degree murder of Nathaniel.[1]

[1]Whether Knight did something that could be considered an "overt act"—more than mere preparation—to carry out the murder of Nathaniel presents a more convoluted question. If the evidence showed Knight in fact harbored the intent to kill Nathaniel, his decision to get out of the car with his pistol arguably would be an overt act in carrying out the completed crime rather than simply a preparatory step. The border between preparatory steps and overt acts is a fuzzy one. See *State v. Garner*, 237 Kan. 227, 239-40, 699 P.2d 468 (1985). Intent dominates here in no small part because the presence of both Tyrel and Nathaniel as potential targets (and victims) renders Knight's actions alone inscrutable as to Nathaniel. If Knight had intended to kill both Tyrel and Nathaniel, shooting at Tyrel first may have allowed Nathaniel to run out of range, effectively turning the intended murder into an attempt. But Knight's actions in getting out of the car and shooting at Tyrel could not have been overt acts in furtherance of the murder of Nathaniel if he never intended to kill Nathaniel. Nothing in the evidence supports a conclusion Knight actually aimed and shot at Nathaniel.

• The majority says Knight had a motive to kill Nathaniel. But that is no more than speculation in light of the evidence. The point requires some legal background on proof of motive and factual background on the alleged motive here.

A defendant's motive is typically relevant in a criminal case, although it is not, strictly speaking, an element of most crimes. The State may, therefore, offer evidence proving motive. *State v. Carapezza*, 286 Kan. 992, 999, 191 P.3d 256 (2008). Motive refers to the reason why a person commits a crime or what the criminal hopes to accomplish. *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009); *Carapezza*, 286 Kan. at 999 (motive "explain[s] why the defendant may have committed the crime"). Motive differs from specific or general criminal intent in that intent addresses the perpetrator's thought process in acting deliberately and purposefully, as opposed to carelessly or accidentally, in carrying out the crime. See K.S.A. 2017 Supp. 21-5202(h)

14

(defining acting "intentionally" or "with intent" for purposes of criminal code); K.S.A. 2017 Supp. 21-5202(i) (defining acting "knowingly" or "with knowledge"); *Carapezza*, 286 Kan. at 999. So the State properly could offer evidence as to why Knight would want to kill Tyrel, Nathaniel, or both of them.

The State presented evidence that Tyrel had testified in a case against Knight about six weeks before the shooting. The evidence also showed that Nathaniel accompanied Tyrel to court and sat in the gallery during his brother's testimony. The jurors were not informed of the type of case, the particulars of Tyrel's testimony, or the outcome of that litigation. And that information isn't readily apparent from the record on appeal. At a pretrial hearing, the parties agreed that the State would limit its trial evidence on motive to showing that Tyrel testified twice against Knight in a case and the dates he testified. The State retained the right to offer additional details of the earlier case if Knight opened the proverbial door to those details. I have inferred from oblique references in the record that Tyrel appeared as a State's witness in a felony criminal prosecution of Knight, perhaps for robbery.

When Tyrel approached Sheeley's car, Sheeley told him, "I heard you been snitching." The jurors could reasonably conclude Sheeley was referring to Tyrel's testimony against Knight. The comment casts Tyrel in a negative light for testifying—it certainly doesn't laud him for performing a civil duty or obligation. Sheeley said nothing about Nathaniel. I recognize a party in a given case could have a motive to seek revenge against a witness who provided significant adverse testimony against him or her. In some circumstances, that desire for vengeance might be strong enough to supply a motive for murder. Given the pretrial accommodation limiting the scope of the motive evidence, the jurors properly could consider those circumstances of Tyrel's testimony in the earlier case in their deliberations in this case.

15

So Knight had a motive to harm—and on the State's theory to kill—Tyrel. But extending that motive to Nathaniel trades in untethered speculation. Nathaniel showed up in the courtroom when his brother testified. That doesn't translate into an obvious or sensible reason to be targeted for murder. Although a demonstrable motive for a crime may be irrational, its existence must be reasonably linked to some proved factual foundation. The trial evidence didn't show that Knight even knew Nathaniel sat in the gallery as Tyrel testified. The majority, then, relies on unsupported speculation wrapped in ungrounded theorizing to drum up a motive for Knight to want to kill Nathaniel. Nothing in the actual trial evidence suggests Knight's murderous motive extended past Tyrel to include Nathaniel. We know from Sheeley's testimony, Knight aimed his pistol and shot at "the dude." And we know from the Saunders brothers' testimony and the physical evidence that the dude was Tyrel. Knight's conduct dovetails with a motive to kill Tyrel.

• When Knight first saw the Saunders brothers jogging, he referred to them as "[t]hese bitch ass niggers." The majority cites that as evidence of Knight's "animus" and apparently, by extension, of an intent to kill and, in particular, to kill Nathaniel. Knight's statement fairly can be considered one of unfriendly identification. He recognized the brothers and enunciated his recognition with a distinctly belittling and offensive epithet that displayed undifferentiated ill-will. But the phrase "bitch ass niggers" doesn't convey an intent to kill:  Those words do not intrinsically communicate a desire to inflict bodily harm or death on the persons so described. They don't even betray some generic criminal intent.

To impute such a meaning based on Knight's decision to fire his pistol constructs a circular argument, especially as to any purported intent to kill Nathaniel. The majority draws criminal meaning from Knight's use of "bitch ass niggers" by relying on his conduct in then shooting at Tyrel. But the conduct evinces only an intent to harm or kill Tyrel. It is legal alchemy to take a negative statement about Smith and Jones on its face

16

devoid of criminal intent, combine it with conduct indicative of criminal intent to kill Smith, and turn it into "evidence" of criminal intent to kill Jones.

So, according to the majority, Knight's conduct in attempting to kill Tyrel imputes a criminal connotation to the term "bitch ass niggers" and that connotation necessarily expands his intent to killing Nathaniel for no reason other than he referred disparagingly to the Saunders brothers in the plural in acknowledging their presence. Neither Knight's statement nor his actions foster a reasoned inference of an intent to kill Nathaniel. In turn, one can't infuse the other to create that inference. The majority offers this illogic as its second and third reasons for affirming the jury's verdict.

• As its fourth reason, the majority invokes a "concurrent intent" theory to hold Knight accountable for attempting to kill Nathaniel when the evidence supported his intent to kill only Tyrel. The case wasn't tried on that theory, and concurrent intent doesn't fit the facts in any event.

The majority premises its argument on Tyrel and Nathaniel being right next to each other when Knight started shooting. But the evidence is otherwise. Both Tyrel and Nathaniel testified that they were in full flight on opposite sides of the street when they heard the first shot. Sheeley offered no testimony on where Tyrel and Nathaniel were relative to each other when Knight started shooting.

Assuming Tyrel and Nathaniel were close to one another when Knight first fired, the State might have crafted a transferred intent theory as to Nathaniel. But the State did not charge or try the case as one of transferred intent. Under a transferred intent theory, a criminal defendant who intends to kill Smith but kills Jones either because of bad aim (the defendant shoots at Smith and hits Jones) or mistaken identity (the defendant believes Jones to be Smith) may be charged and convicted of the murder of Jones. The law transfers the defendant's bad intent or mens rea directed at Smith, as the intended

target, to Jones, as the extraordinarily unlucky actual victim. See *State v. Jones*, 257 Kan. 856, Syl. ¶ 2, 896 P.2d 1077 (1995). Transferred intent, however, is different from concurrent intent.

As outlined in *People v. Bland*, 28 Cal. 4th 313, 48 P.3d 1107, 121 Cal. Rptr. 546 (2002), the case on which the majority relies, concurrent intent comes into play when the defendant intends to kill Smith and uses a lethal instrumentality or method that foreseeably endangers anyone in the immediate vicinity of Smith. The defendant may be charged and convicted of murder or attempted murder of those bystanders. In recognizing concurrent intent, the California Supreme Court held that transferred intent could not be used to support a charge of attempted murder as an inchoate crime. 28 Cal. 4th at 329-30.

The court, then, explained that concurrent intent furnishes an alternative legal basis to convict when the defendant intends to kill a specific individual and employs a means that necessarily exposes other persons to potentially deadly force. The defendant, thus, concurrently intends to kill those persons and can be charged with their murder or attempted murder. The court cited as an example placing a bomb on a commercial airliner for the purpose of killing a particular passenger. Similarly, a defendant who, with his or her cohorts, directs a barrage of gunfire at a motor vehicle to kill one of several occupants demonstrates the requisite concurrent intent to harm the nontargets caught in that confined environment. The defendant's conduct in those situations creates a "'kill zone'" and evinces a concurrent intent to kill not only the intended target but anyone within that zone. 28 Cal. 4th at 329-30 (quoting *Ford v. State*, 330 Md. 682, 716-17, 625 A.2d 984 [1993]).

Knight's conduct in firing his pistol, even seven times, did not create a kill zone of the sort described in *Bland* and, therefore, would not support some form of concurrent intent. Even under the majority's mistaken construction of the facts, Tyrel and Nathaniel would have been close to one another for a matter of seconds as Knight fired a shot or

18

two. As I have pointed out, the brothers actually testified they were on opposite sides of the street when the shooting started. Even if Knight had a fully automatic weapon with a high capacity magazine, his decision to shoot at Tyrel on one side of the street would not have created a kill zone for Nathaniel or anyone else on the opposite side of the street. The majority's reliance on a concurrent intent theory to prop up the verdict doesn't work because it is factually inapposite.[2]

[2]The parties addressed neither transferred intent nor concurrent intent in their briefing. So the majority's reliance on the California Supreme Court's limitation on transferred intent and its recognition of concurrent intent arrives without any studied input from the parties. I defer any substantive discussion of the legal ramifications of those issues to another case in which they have been joined and briefed. See *State v. Cooper*, 48 Kan. App. 2d 671, 673, 301 P.3d 331 (2013) ("The adversarial system rests, in part, on the notion that competing arguments from opposing sides will define and clarify the court's resolution of the dispute."). Whether transferred intent applies to attempted murder or other inchoate crimes has split the appellate courts in other jurisdictions. See *State v. Dean*, 146 Ohio St. 3d 106, 131-34, 54 N.E.3d 80 (2015) (noting division and permitting transferred intent in prosecution for attempted murder). The Kansas appellate courts have not waded directly into that controversy. Nor have they discussed concurrent intent. At least superficially, the application of transferred intent to inchoate crimes under current Kansas law may be more a matter of academic interest than practical effect. Concurrent intent, likewise, appears to complement rather than supplant transferred intent for both attempts and completed crimes.

• The majority relies on what it characterizes as the perceptions of Tyrel and Nathaniel that Knight fired at both of them. The Saunders brothers told the police they believed Knight shot at them. But their beliefs were lay opinions without support in what the brothers actually saw and heard, rendering those conclusions mere speculation. Lay witnesses may offer opinions that aid in providing a clear understanding of the facts conveyed in their testimony. K.S.A. 2017 Supp. 60-456(a); *State v. Hinchsliff*, No. 103,608, 2011 WL 4031502, at *8 (Kan. App. 2011) (unpublished opinion). Neither Tyrel nor Nathaniel saw where Knight aimed his pistol after he got out of Sheeley's car— Nathaniel never even saw the gun; he only heard the shots. As I have already discussed, Nathaniel did *not* have any sensory perception that one or more of the bullets came in his

direction. Tyrel did perceive bullets fired at him, and the limited physical evidence confirmed his perception. But Tyrel's testimony did not factually support the notion that Knight fired at Nathaniel. So the opinions the Saunders brothers expressed to the police, though honestly held, carried no evidentiary weight. They were suppositions rather than perceptions and could not furnish a foundation for the jury's verdict.

The majority takes a bit of Sheeley's testimony out of context to suggest he told the jurors Knight shot at both Tyrel and Nathaniel. He didn't. After Sheeley testified Knight got out of the car, the prosecutor asked, "Which way did [Knight] shoot?" Sheeley replied: "Back towards the dudes, which I guess is east—is that east?" The prosecutor had Sheeley look at a diagram of the street that indicated which direction was north. And the prosecutor then asked, "So you see him shooting back to the south?" Sheeley responded, "Yes." When Sheeley testified Knight fired "back towards the dudes," he was identifying the direction of the shots—not the targets. The line of questioning considered in full and correctly understood does not furnish evidence that Knight shot at Nathaniel or harbored an intent to kill him. As I have already said, Sheeley later testified that Knight pointed his hand and, thus, the pistol at "the dude" as he fired, delineating a single target.

• Finally, the majority similarly takes out of context my description of the special role jurors play in resolving factual conflicts in testimony from multiple witnesses. In concluding my dissenting opinion in *State v. Bellinger*, 47 Kan. App. 2d 776, 807, 278 P.3d 975 (2012) (Atcheson, J., dissenting), I stated:

> "Human endeavors are often messy, perhaps no more so than when they turn violent and people wind up seriously injured or dead. The trauma of witnessing those sorts of events can confuse and confound recollections. This is a case in which the facts surrounding a few minutes in the lives of the Bellinger clan on June 4, 2009, are messy. Taking those facts most favorably to Robert Bellinger, he has presented circumstances permitting him to advance a claim of self-defense. We have juries to clean up those messes by weighing evidence, evaluating credibility, and finding facts. But juries then

20

must be fully instructed on the relevant law to know what to do with those facts. The jury in Robert Bellinger's trial was not so instructed. And as a result, he was deprived of a fair hearing on his claim of self-defense. He is, in my view, entitled to another trial."

The issue in that case was whether the district court should have instructed the jury on self-defense. Bellinger got into an argument with his brother, who had driven to his farm; he ended up shooting his brother once. The jurors heard four varied accounts of the confrontation—from Bellinger, his brother, his brother's wife, and his brother's son. In my view, Bellinger's version, if believed, warranted a jury instruction on self-defense. See *State v. Haygood*, 308 Kan. 1387, 1406-07, 430 P.3d 11 (2018). I pointed out that the jurors had the duty to evaluate the credibility and accuracy of the differing accounts of what happened and to return a verdict consistent with their determination of the facts and the governing law. In turn, they needed to be instructed on the legal principles that could apply depending on what they concluded actually happened.

All of that is equally true of the jurors in this case, but my observations in *Bellinger* have nothing to do with the legal issue Knight has raised going to the sufficiency of the evidence. In assessing the sufficiency of the evidence to support the guilty verdict, we put aside possible credibility determinations the jurors may have made and assume they resolved every conflict in the State's favor. Based on that assumption, we then ask if that construction of the evidence legally supports the verdict. In this case, it does not because none of the evidence reasonably establishes that Knight intended to kill Nathaniel—an element of attempted intentional second-degree murder. The judicial determination does not usurp the jurors' role as fact-finders, since it involves no resolution of conflicting evidence. But it provides a brake against a conviction based on legally inadequate evidence.

The majority essentially short-circuits that process by saying we have juries to evaluate trial evidence and this jury evaluated the evidence, so the verdict should be

21

accepted. And that would be fine if jurors performed perfectly. But we know they don't. We, therefore, call upon judges to determine if, as a matter of law, the best evidence for the State permits a guilty verdict. Here, it does not. I would reverse Knight's conviction for the attempted second-degree murder of Nathaniel Saunders.