IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,442

STATE OF KANSAS,
*Appellee*,

v.

KALEB P.R. HOGAN,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 60-407(f), courts may allow use of all relevant evidence, which is evidence having any tendency in reason to prove any material fact. Relevance has two components: materiality and probative value. A material fact has some real bearing on a decision in the case, and probative evidence tends to prove any material fact.

2.

The party attempting to admit evidence carries the burden to establish a foundation.

3.

Upon a proper objection based on an evidentiary rule other than K.S.A. 60-407(f), a district judge applying Kansas' rules of evidence may be called upon to either deny the admission of relevant evidence, limit the reasons relevant evidence can be considered, or redact portions of the evidence. Additionally, a district judge may be required to deny the admission of relevant evidence because of its undue prejudice.

1

4.

Under K.S.A. 2024 Supp. 60-455(a), evidence that a person committed a crime or civil wrong on a specified occasion is inadmissible to prove such person's disposition to commit a crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion. But under K.S.A. 2024 Supp. 60-455(b), evidence that the person committed a crime or civil wrong on a specified occasion may be admitted if relevant to prove a material fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

5.

Admission of prior crimes evidence independent of K.S.A. 2024 Supp. 60-455 is contrary to long-held common law and the text of the statute itself.

6.

The party benefiting from the erroneous admission of evidence bears the burden of proving the error was harmless. Appellate courts applying Kansas' statutory harmless error standard in K.S.A. 2024 Supp. 60-261 disregard errors that do not affect the substantial rights of the parties to determine whether there is a reasonable probability that an error will or did affect the outcome of the trial considering the entire record.

Appeal from Butler District Court; DAVID A. RICKE, judge. Oral argument held January 30, 2025. Opinion filed August 1, 2025. Reversed and remanded.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Darrin C. Devinney,* county attorney, argued the cause*,* and *Cheryl M. Pierce,* assistant county attorney, and *Kris W. Kobach,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.:  A jury convicted Kaleb Paul Ron Hogan of felony murder and the underlying felony of child abuse after Hogan's three-month-old son died. In this direct appeal from those convictions, Hogan primarily argues we must reverse his convictions because the jury heard evidence about uncharged, suspected child abuse that occurred over the two months preceding the baby's death. The judge admitted the evidence under K.S.A. 2022 Supp. 60-455, but Hogan argues the statute does not apply because the prior child abuse is irrelevant. He notes that the State did not charge him with any crimes for prior abuse, the State failed to prove he committed the crimes, and the prior injuries are not part of the cause of death. Hogan emphasizes that the State failed to prove who committed the early injuries even after investigating his son's death.

The Butler County Attorney effectively agreed with this contention during his arguments before us. He conceded that many people cared for the baby and he did not know who among them caused the prior injuries. He concluded "that's precisely why [Hogan's] not charged with the crime of child abuse" for any injuries other than those that led to the baby's death. Given the record before us which verifies the State's concession, we conclude admission of the evidence under K.S.A. 2022 Supp. 60-455 fails and prejudicial error occurred in admitting the prior crimes evidence under this statute.

The State offered alternative grounds for the admission of this evidence. The record establishes that these grounds are either inadequate or were not presented to the jury in a nonprejudicial manner. We thus reverse Hogan's convictions, vacate his sentences, and remand to the district court for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

Hogan and his partner, S.A., had a son on December 17, 2020. Their son died on March 23, 2021, after Hogan called 911 and reported his son was vomiting, not breathing, and unresponsive. Physicians determined the three-month-old baby had suffered fractured ribs, and they detected bleeding around the brain. They suspected child abuse.

As doctors, hospital personnel, and law enforcement officers visited with the parents, they learned the baby had a history of being fussy. The mother, who has an older daughter, noticed her son seemed fussier than most other babies and was difficult to soothe. She described how the baby, beginning about three weeks of age, would scream to the point he got red, hold his breath, and refuse to eat. He was scheduled for a doctor's appointment in April for testing if he continued to be excessively fussy.

Throughout his life, the child had various caregivers, including his parents, grandparents on both sides, and other babysitters. In the 24 hours before he died, however, he was exclusively in the care of his parents.

*March 23, 2021—the date of hospitalization*

The morning of the baby's hospitalization began with both Hogan and S.A. at home with their son. As S.A. prepared for work, she fed her son and put him to sleep. She left around 7 a.m., when Amber Harp, Hogan's mother, arrived to drive her to work. During their commute, according to Harp, S.A. said the baby woke several times during the night and had vomited.

Once S.A. left, Hogan cared for the baby. Around 9:30 a.m., the baby woke, and Hogan rocked him and put him back to sleep. The baby woke again, drank another bottle,

4

and went back to sleep around 1 p.m. Later in the afternoon, the baby woke and was fussy. Hogan went to the kitchen and prepared two bottles after making the first one too hot. Hogan returned to the baby and found he had vomited and was not breathing.

Hogan called 911. Hogan administered CPR following the 911 operator's instructions. Responders arrived at about 2:40 p.m., about eight hours after S.A. left for work. Medical personnel began treating the baby on the scene before taking him to the hospital.

As emergency room personnel worked on the baby, they took a chest x-ray while inserting a breathing tube. The x-ray showed healing rib fractures, which made them believe the baby had suffered prior physical trauma. They advised law enforcement of their concern.

Hospital personnel also requested a consultation with Dr. Kerri Weeks, a child abuse pediatrician. After Dr. Weeks' evaluation, she told the law enforcement officers that she suspected child abuse. She pointed to evidence of injuries around the brain and ribs that were at different stages of healing, indicating evidence of prior abuse as well as a current episode.

*Law enforcement interviews of parents*

Law enforcement officers interviewed both parents. When asked about prior injuries to the baby, the baby's mother reported the baby had bruising on his ribs when he was about a month old. The mother thought the bruising came from a buckle on the cloth carrier she used to carry the baby while doing household chores. The bruising was apparent when the mother took the baby to a scheduled appointment with the baby's pediatrician. The pediatrician advised the mother to use a different carrier. This was the only injury she reported to the doctor, and she denied any other harm to the baby. She did

5

say that Hogan yelled at the baby one time, and she had taken the baby from him. She discussed the incident with Hogan's mother. Hogan's mother and S.A. advised Hogan to hand the baby over to someone else or place the baby somewhere safe and step away if he became frustrated with the baby.

The police interviewed Hogan two times. During his first interview, he denied abusing his baby and he led them through the events of the day before he called 911. At the next interview, he described two additional situations besides the events before he called 911. In one, he shook the baby in a manner he described as "gentle." On the second occasion, he gave the baby to S.A. Hogan also again described the events before he called 911. He reported that he shook the baby after the baby went limp and before he called 911 as he tried to get the baby to cry or otherwise respond when he was not breathing.

In providing more detail about the two shaking instances, Hogan first described shaking the baby in his efforts to revive him on the day the baby was hospitalized. Hogan noticed the baby was limp. After he tried to clear the baby's airway, he shook the baby to get a reaction. He reported that he "didn't shake him long, [and he] didn't think [he] shook him long." In the videotaped interview that was shown to the jury, Hogan demonstrated how he handled the baby, wrapping both hands around the baby's torso just under the baby's arms and moving the baby a few inches back and forth.

In speaking about the other occasion, Hogan recounted when the baby was about a month or month-and-a-half old and the baby was crying around 2 a.m. Hogan said he was tired and had to work the next morning. He again described holding the baby by the baby's sides and shaking the baby to calm him and put him back to sleep. He characterized the shaking as being "gentle" and an attempt to get the baby to quiet down. He demonstrated his actions during his interview. The baby settled a little, then started crying again. Hogan did not observe anything wrong with the baby at that time. S.A. was home but asleep when this happened.

6

The law enforcement officers told Hogan they thought he was minimizing how he shook the baby. They observed that he was not showing them a shaking that would cause the type of injuries his son suffered. Hogan replied that he did not know if these two instances caused injury, but they were the times he shook the baby. He also repeatedly denied shaking the baby on March 23 before the baby went limp. He reported that he did not know of any falls or injuries to the child.

*State's trial evidence*

The State charged Hogan with violating K.S.A. 2020 Supp. 21-5602(a)(2) when, on "the 23rd day of March, 2021 in Butler County, Kansas," he did "unlawfully and knowingly shake a child under the age of eighteen (18) years of age." Hogan defended by attempting to point to S.A. as the person who harmed the baby. In response to that defense, the State argued Hogan admitted to shaking the baby and was the person providing care during the critical hours before the 911 call.

To help prove the State's theory, it called S.A. who testified the baby giggled for the first time before she left for work on the morning of his hospitalization. She denied ever harming the baby or seeing Hogan harm him. The State also relied on the medical experts who had treated the baby and performed his autopsy. This included Dr. Weeks, the child abuse pediatrician.

Dr. Weeks testified that she found evidence of prior posterior rib fractures that were healing. She explained these injuries are highly associated with abuse in babies. Dr. Weeks told the jury that a baby's ribs can be fractured when a person wraps their hands around the baby's rib cage and squeezes with enough pressure that their fingers crush the back of the baby's rib cage. She also explained that head trauma frequently accompanies these injuries, and here a CT scan showed bleeding on both sides of the

7

baby's brain that was diffuse and of a mixed density. This indicated to her that the bleeding probably occurred on different occasions. There was also evidence of a brain injury due to lack of oxygen.

An M.R.I. performed two days after the baby's hospitalization, which is the timeframe during which trauma-induced brain swelling often peaks, revealed irreversible brain injury that was not survivable. Dr. Weeks diagnosed physical child abuse. She testified the fatal brain injury would have occurred around the same time as the baby became unresponsive, potentially moments or hours before. She explained that the abuse could have been inflicted by shaking the baby, slamming or causing an impact on the baby's head, or both. Weeks testified that Hogan's report that the baby vomited and was not breathing was consistent with symptoms of brain injury. Examinations of the baby's eyes revealed extensive hemorrhages in the retinas, supporting her diagnosis.

On cross-examination, Dr. Weeks agreed two to four hours could have passed from the time the baby was injured to the time he vomited and stopped breathing, but she testified a child becomes immediately unresponsive in most cases. She rejected the possibility of an eight-hour lag between injury and symptoms.

Dr. Weeks told the jury that the rib injuries were consistent with how Hogan reported holding the baby with his hands wrapped around the baby's chest. But she explained she did not personally view the video in which Hogan demonstrated how he shook the baby; she had only heard a description of the demonstration from a law enforcement officer. She also said that gently shaking the baby, which is all Hogan admitted to, would not cause the injuries she observed.

Another expert called by the State was Dr. Jamie Oeberst, who performed an autopsy on the baby. She testified to old injuries, pointing to as many as 16 healed rib fractures. She also described more recent injuries. Some of the rib injuries may have

8

occurred up to two months before death. More recent ones likely occurred in the preceding 7 to 14 days. And some were acute, or new, fractures. She found bruising on the baby's cheek, behind his right ear, on the back of his head, and on his scalp, as well as abrasions around his head and neck.

Dr. Oeberst also found evidence of hemorrhaging in areas around the baby's brain and retinal and cervical hemorrhages, which medical professionals look for in cases of suspected child abuse. She further noted hemorrhaging around his ribs, indicating more recent injuries on top of old fractures. She explained that the baby's brain had been damaged due to lack of blood circulation and oxygen.

Dr. Oeberst used photographs taken during the autopsy to describe the baby's injuries as she explained how shaking can play a role in blunt force trauma. She reported that an adult squeezing a baby's chest can cause injuries that are strongly associated with child abuse. She also detailed her examination of the baby's spine and her discovery of hemorrhaging. She explained the scientific theory about how a cervical spine can be injured during a shaking event. She ultimately opined that the baby died from craniocerebral spine trauma with blunt force injuries and the manner of death was homicide.

On cross-examination, Dr. Oeberst explained blunt force trauma can result from the child being struck with a blunt object or being swung into a blunt object, but she could not rule out shaking as a cause of the trauma to Hogan's son. She reiterated that the respiratory arrest can be delayed but the child would show some signs of the trauma and would likely become unconscious or semi-conscious within a short time.

*Hogan's defense*

Before trial, Hogan filed a motion in limine and asked the district judge to exclude evidence of the baby's prior injuries and of any portion of Hogan's statements to law enforcement officers in which he talked about a shaking before March 23, 2021. The judge denied the motion and all evidence about prior injuries was introduced at trial. We will discuss this motion and the ruling in more detail when we discuss the basis for Hogan's first issue in this appeal.

Hogan also admitted evidence refuting the State's case, including the testimony of Dr. Lyle Noordhoek, a pathologist. Dr. Noordhoek testified that the baby died from blunt trauma inflicted with a force felt longitudinally front to back, consistent with a blunt slamming of the body. Dr. Noordhoek did not find evidence of a shaking rotational injury. He explained that the motions Hogan demonstrated during his law enforcement interview would not cause the type of injuries observed in the baby. Dr. Noordhoek testified that 12 to 24 hours could have passed between the trauma and when the baby stopped breathing. Dr. Noordhoek explained a child could initially display no noticeable symptoms but would eventually experience respiratory or cardiac arrest, possibly both, because of the injuries. Dr. Noordhoek testified the photos showing bleeding in the baby's brain supported his conclusion that a significant period passed between injury and death because a blood clot had formed on the brain. He elaborated that he saw various areas of bleeding that coalesced and then started to overlap, which also indicated significant time passed from injury until death. On cross-examination, Dr. Noordhoek agreed that the acute brain bleed occurred within 12 hours of hospitalization.

By identifying a larger period in which the injuries might have been inflicted, Hogan's defense implicated S.A. as a potential suspect. Hogan supported his theory with evidence of S.A.'s deteriorating mental health after the baby was born and with evidence

the mother struck her older child. The evidence that supported these conclusions came from two sources.

First, trial evidence established that S.A.'s doctor proscribed Zoloft to treat anxiety after the baby's birth. S.A.'s anxiety began before the baby's birth, as S.A. expressed her fear that her baby would die because two of her half-brothers died of SIDS shortly after their births. She worried about getting attached to a baby who would die. S.A.'s anxiety continued after the baby's birth. S.A. suffered nightmares and flashbacks to the deaths of her brothers, except she reported seeing her son in place of her brothers. S.A.'s symptoms increased shortly before her son died. Her doctor increased the dosage of Zoloft and added another medication to help treat night terrors and nightmares.

Second, Hogan's mother testified S.A.'s older daughter sometimes lived with S.A.'s father and stepmother. She testified to witnessing S.A. hit her daughter in the mouth after the daughter refused to get out of a swimming pool. The daughter's mouth bled after she was hit. Hogan's mother alluded to another abuse incident she did not witness.

*Verdict and posttrial motions*

A jury convicted Hogan of felony murder and the underlying felony of child abuse committed by knowingly shaking a child and causing great bodily harm. Hogan timely filed a motion for a new trial in which he argued the district judge erred by allowing evidence of the prior injuries; this included some medical records, the autopsy report, physician testimony, and statements Hogan made about events before March 23, 2021. The motion also claimed jury instruction and other errors, including a claim that Hogan's trial counsel was ineffective.

The district judge denied the motion for a new trial and sentenced Hogan to life imprisonment with parole eligibility after 25 years.

Hogan timely appealed, and we have jurisdiction. K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 2024 Supp. 22-3601(b)(3)-(4) (direct appeals to Supreme Court allowed for life sentence and off-grid crimes); K.S.A. 21-5402(b) (first-degree murder is an off-grid person felony).

ANALYSIS

Hogan raises four issues on appeal. He first contends the district judge erred by denying his motion in limine and in allowing the State to admit evidence of any prior injuries because those prior injuries lack relevancy or because any probative value of the evidence was outweighed by its prejudicial effect. He also contends two jury instructions were erroneous. One was a jury instruction designed to limit the jury's consideration of the evidence about the prior injuries. The other disputed instruction told the jury it could not convict Hogan of felony murder if it found he did not commit child abuse. Finally, he discussed the cumulative effect of the errors, arguing the prejudice they caused requires us to reverse his convictions and sentences.

We do not fully discuss all these issues because we reverse Hogan's convictions based on his contention that the jury should not have heard the evidence about alleged child abuse that occurred before March 23, 2021. But we briefly discuss Hogan's remaining issues as they might arise again in the remand proceedings before the district court.

We begin our analysis with the primary focus of the parties' arguments relating to the State's use of evidence about child abuse that happened before March 23, 2021.

12

1. *Error in admitting prior crimes evidence*

Hogan framed the first issue with his pretrial motion in limine in which he asked the judge to exclude evidence of any injury to the baby that happened before March 23, 2021, and any statements made by Hogan to law enforcement officers about his handling of the baby before that date. Hogan argued evidence about prior injuries lacked relevancy because experts of both the State and the defense agreed the injuries that caused death occurred no more than hours before Hogan's 911 call—in other words, on or about March 23, 2021, which is the period covered in the State's charge against him. Hogan noted that he was not charged with any prior offenses, and the State had not proven the prior injuries caused or contributed to the cause of his son's death. He also argued the evidence would be "extremely prejudicial" to him because the State had not presented any physical evidence or opinion evidence about who committed the prior abuse or how the injuries happened.

The State filed no written response to Hogan's motion but orally responded at the hearing before the district judge. The State asserted that Hogan's statements to the law enforcement officers could be heard by the jury because an accused's voluntary statements to law enforcement officers may be admitted at trial. The State also argued that the prior injuries must be considered because they were mentioned throughout the autopsy report and other medical evidence that it planned to present to the jury.

Hogan's counsel reiterated that the State had not shown how the prior injuries related to the baby's death. The district judge focused on that point and asked the prosecutor for an "explanation as to the injuries that were discovered that were . . . old injuries." The prosecutor replied: "I don't really know what it is that [defense counsel] is talking about when he says that." Despite the lack of an evidentiary foundation or an argument from the State, the judge turned to a law enforcement officer's probable cause affidavit issued in support of Hogan's arrest. The officer had recounted Dr. Weeks' report

13

of prior injuries and reported that Hogan confessed to shaking the baby about a month or six weeks earlier. The judge concluded the action Hogan described "I think, logically, could be construed as being a cause of those old injuries." Later, in more formally stating the basis for allowing the evidence to be admitted, the judge found "that there is evidence that would be produced at trial that there is a causal link between this defendant and the older injuries that this child suffered."

Thus, at this pretrial hearing, the State did nothing to lay a foundation, and the judge filled in the holes. This trend continued. At trial, when Hogan objected to the introduction of evidence about prior abuse, the State responded by saying, "[T]his was something that was determined by the Court to be admissible. They were part of [an] autopsy report . . . as well as the child abuse examination. They were part of that. The Court has already ruled on this." The judge referred to his prior ruling, reiterating the points he had made during the pretrial hearing, and overruled the objection. Hogan then made a continuing objection to the prior crimes evidence and the admissibility issue was not discussed again, except in discussing the jury instruction, during the trial. At that time the parties agreed to a jury instruction that advised the jury the evidence could be considered for only limited purposes:

> "Evidence has been presented of the existence of prior injuries to [the baby] that could indicate trauma consistent with child abuse. You shall not consider the evidence of such older injuries to support conviction for either the child abuse or the felony murder charge. However, you may consider such prior injuries in determining an absence of mistake or accident, whether the defendant's alleged actions were done knowingly on or about March 23, 2021, or in weighing the credibility of statements made by the defendant in the recordings admitted into evidence in this case."

The State expressed no concerns throughout any of the district court proceedings about relying on K.S.A. 2022 Supp. 60-455, which permits evidence of prior acts under some circumstances. Nor did it raise concerns during its briefing to this court. It appears

14

the State remained silent until it expressed its conclusions during oral arguments before us.

At oral argument, several justices asked questions about admissibility under K.S.A. 2022 Supp. 60-455 under the facts of the case, including questions about whether Hogan had committed a prior crime or civil wrong. The county attorney, as the chief advocate for the State, at several points in response to these questions indicated he did not know who caused the prior injuries. Toward the end of his argument, the prosecutor said, "I have no idea who committed the injuries or how those injuries occurred from six weeks before." He recognized that Hogan had mentioned shaking the baby about a month or six weeks before the death, but he said the evidence about the situation was insufficient and many people had contact with the baby. He reported that he did not know who might have caused the prior injuries and concluded "that's precisely why [Hogan's] not charged with the crime of child abuse" for the prior injuries.

### 1.1. *State's initial failure to meet its burden*

Hogan argues these exchanges illustrate the State's repeated failure to meet its burden to lay a foundation for the admission of disputed K.S.A. 60-455 evidence. We agree.

In making this point, Hogan's starting point is to discuss relevance, which is the starting point for many evidentiary disputes because "all relevant evidence is generally admissible." K.S.A. 60-407(f). Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance has two components: materiality and probative value. "A material fact is one that has some real bearing on the decision in the case," and probative evidence tends to prove any material fact. *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022).

The party attempting to admit evidence carries the burden to establish a foundation. *State v. Contreras*, 313 Kan. 996, 1000-01, 492 P.3d 1180 (2021); see K.S.A. 60-408 (discussing judge designating party with burden). Before trial and during the trial, when the judge called on the State to establish the basis for admission, the State repeatedly relied on two arguments: (1) Hogan made statements to law enforcement officers that included references to things throughout the baby's life and (2) the baby's medical records and testimony of those who treated him included references to prior abuse. These sources are grounds for the admission of evidence in a first-degree murder trial. See K.S.A. 2024 Supp. 60-460(f) (hearsay exception allowing use of defendant's statements); *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) ("Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); *State v. Boyd*, 216 Kan. 373, 378, 532 P.2d 1064 (1975) (recognizing use of medical and autopsy evidence to prove cause of death, although finding some autopsy photos prejudicial). Thus, the State is generally correct that Hogan's statements and the medical record are relevant.

Yet these general principles about admissibility of an accused's voluntary statement are just that—general. Upon a proper objection based on an evidentiary rule other than K.S.A. 60-407(f), a district judge may be called upon to either deny the admission of relevant evidence, limit the reasons relevant evidence can be considered, or redact portions of the evidence. Additionally, a district judge may be required to deny the admission of relevant evidence because of its undue prejudice. See *State v. Lowery*, 308 Kan. 1183, 1226-27, 427 P.3d 865 (2018). These protections may be necessary to protect the fundamental constitutional rights to a fair trial and to be presumed innocent as guaranteed by the United States Constitution and Kansas Constitutions. See *State v. Boysaw*, 309 Kan. 526, 530-35, 439 P.3d 909 (2019) (general discussion of federal and Kansas constitutional rights impacted by K.S.A. 2018 Supp. 60-455).

16

Hogan contends the Kansas Legislature has restricted evidence about the prior alleged child abuse by enacting K.S.A. 60-455. He seeks enforcement of that restriction to exclude portions of his statements to law enforcement officers and references to prior abuse in the medical records and testimony. As he argues, the trial record includes multiple references to child abuse, the crime with which he was charged, that occurred over the child's life, that is, before March 23, 2021. But K.S.A. 2024 Supp. 60-455 restricts the evidence a jury may hear about previous crimes committed by "a person," who is usually the defendant.

Under K.S.A. 2024 Supp. 60-455(a) "evidence that *a person* committed a crime or civil wrong on a specified occasion, is inadmissible to prove *such person's* disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." (Emphases added.) There is an exception, however, as the next subsection of K.S.A. 2024 Supp. 60-455 allows the admission of evidence that *the person* committed a crime or civil wrong on a specified occasion when that fact is relevant to prove some other "material fact." The subsection recognizes eight potential material facts, including "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2024 Supp. 60-455(b). The eight, potential material facts listed in K.S.A. 2024 Supp. 60-455(b) are not exclusive but exemplary, however. *State v. Gunby*, 282 Kan. 39, 56, 144 P.3d 647 (2006).

The point of this statute, when applied to cases that do not involve sexual misconduct, is to prohibit admission of evidence for the purpose of proving a person's inclination, tendency, attitude, propensity, or disposition to commit crime. *State v. Bly*, 215 Kan. 168, 175, 523 P.2d 397 (1974). When this evidence is used against an accused, concerns arise that allowing juries to hear of alleged prior wrongs raises at least three potentially prejudicial possibilities. First, the jury may inflate the value of the other

17

crimes and improperly infer that past crimes mean a defendant has committed the charged crime, even if the charged crime has not been proven beyond a reasonable doubt. Alternatively, the jury may decide the defendant deserves punishment as a general wrongdoer. Finally, the jury may dismiss evidence presented by the defendant under the belief he or she is a criminal. *Gunby*, 282 Kan. at 48; see Advisory Committee on the Revised Code of Civil Procedure, Kansas Judicial Council Bulletin, Special Report 129-30 (November 1961); Slough, *Other Vices, Other Crimes: An Evidentiary Dilemma*, 20 U. Kan. L. Rev. 411, 416 (1972).

Considering these concerns, in *Gunby* we held that this court's past cases allowing admission of prior crimes evidence "independent of K.S.A. 60-455 are contrary to long-held common law and the text of the statute itself. The practice of admitting evidence independent of K.S.A. 60-455 also is unnecessary and carries the potential to violate a criminal defendant's fundamental right to a fair trial." *Gunby*, 282 Kan. at 49. Later in the opinion, we reiterated that we were putting "an end to the practice of admission of other crimes and civil wrongs evidence independent of it." 282 Kan. at 57. The State's arguments about admitting all of Hogan's statements and all medication information conflict with this prohibition.

As the *Gunby* holding emphasizes, because of the evidence of prior abuse in Hogan's statements and in the medical information, the State needed to present a foundation for the admission of the evidence under K.S.A. 2020 Supp. 60-455. Hogan contends the State failed to do so.

1.2. *State's requirements under K.S.A. 2024 Supp. 60-455*

Hogan argues that the State primarily failed to lay a proper foundation when it failed to show he committed the prior abuse. The record establishes that the evidentiary

18

basis for the admission was a probable cause affidavit relied on by the district judge. That limited record did not reveal the scope of the evidence relevant to laying the foundation.

Before admitting evidence under K.S.A. 2024 Supp. 60-455, a district judge must analyze the materiality of the other crimes evidence, evaluate whether the material facts are disputed and the evidence would thus be probative, and weigh the prejudice of the other crime evidence against its probative value. Later, the judge must consider instructions to the jury about how it can consider the prior crime evidence and reasons it cannot consider the evidence. *State v. Torres*, 294 Kan. 135, 139, 273 P.3d 729 (2012). Here, the district judge walked through those steps at the pretrial hearing. But Hogan argues the judge failed to serve its gatekeeper role because it did not require the State to more fully lay out the evidence the State would seek to introduce at trial to prove Hogan committed the prior abuse. Likewise, the State never offered the material points it felt were at issue. Hogan primarily focuses on the first two analytical points of proving materiality and probativeness, although weighing prejudice also comes into play.

Under the first step, the district judge "must determine whether the fact to be proven is material, meaning that this fact has some real bearing on the decision in the case." *Torres*, 294 Kan. at 139. When an appellate court reviews that assessment, it evaluates the district judge's determination de novo, meaning without deference to the district court. 294 Kan. at 139. Here, the proposition was that if Hogan committed prior child abuse some material facts were in issue, but Hogan argues the State failed to prove he was the perpetrator.

Under the second step of analysis, the district judge "must determine whether the material fact is disputed and, if so, whether the evidence is relevant to prove the disputed material fact. In making this determination, the district [judge] considers whether the evidence has any tendency in reason to prove the disputed material fact." 294 Kan. at 139-40. This includes determining the probativeness of any evidence about whether the

19

defendant committed a prior crime and, if the defendant committed the crime, whether any of the eight material factors in K.S.A. 2024 Supp. 60-455 or any other factor is relevant and disputed. An abuse of discretion standard is applied by appellate courts. 294 Kan. at 140. District judges abuse their discretion by reaching a decision (1) with which no reasonable person agrees; (2) that is an error of law; or (3) is not supported by substantial competent evidence. *State v. Claerhout*, 310 Kan. 924, 928, 453 P.3d 855 (2019).

In considering prejudice, the district judge considers whether the probative value of the prior crimes evidence outweighs the potential for undue prejudice against the defendant. Appellate courts also apply an abuse of discretion standard when reviewing this step. In *Claerhout*, we urged judges to use an analytical standard that had previously been used in sexual misconduct cases, but which can apply in other cases and seems particularly appropriate here where the evidence is disputed. Under this standard, the judge should consider the weight of the evidence, its probativeness, whether it is disputed, and whether the State can obtain less prejudicial evidence. The judge is also to weigh whether the evidence could contribute to an improperly based verdict, whether it will be distracting, and the time it will consume. 310 Kan. at 930 (quoting *Boysaw*, 309 Kan. at 541).

### 1.3. *State's failure to lay a foundation*

Hogan argues the State made no effort to provide proof of these various steps; in other words, he contends the State failed to lay the necessary foundation. He first raised this issue during the motion in limine hearing when he pointed to K.S.A. 2022 Supp. 60-455(e). This provision requires a prosecuting attorney to disclose K.S.A. 2022 Supp. 60-455(e) evidence to a defendant at least 10 days before trial or as ordered by the judge. The district judge gave the State the opportunity to speak about the use of K.S.A. 2022 Supp. 60-455 on several occasions. The State essentially chose to remain silent, and the

district judge concluded Hogan had been made aware of the evidence during the pretrial hearing on his motion in limine.

Yet several authorities stress the importance of obtaining a full investigation of the evidence from the State. The *Claerhout/Boysaw* prejudice standard reveals the need for this full development. See, e.g., *Claerhout*, 310 Kan. at 930-32; *Boysaw*, 309 Kan. at 541. See also *State v. McGinnis*, 193 W. Va. 147, 155-56, 455 S.E.2d 516 (1994) (state should provide notice of who committed the prior crime and evidence to be used in proving material facts, including identifying defendant as prior actor and material factors establishing materiality and probativeness). As the Pattern Instruction Committee for Kansas has recognized in speaking about K.S.A. 60-455, "the task of determining admissibility can best be performed in an organized and unhurried atmosphere in which the parties can fully explore the evidentiary pattern." PIK Crim. 4th 51.030, Comment II.A.

Part of this evidentiary pattern is that ultimately the jury must be convinced the defendant committed the prior crime or civil wrong. We have held it is not necessary to prove that the defendant was convicted of the other offense. E.g., *State v. Powell*, 220 Kan. 168, 172, 551 P.2d 902 (1976). But evidence must be submitted linking a defendant to the prior crime. This is because, "[o]bviously, the line of reasoning that deems an extrinsic offense relevant to the issue of intent is valid only if an offense was in fact committed and the defendant in fact committed it." *United States v. Beechum*, 582 F.2d 898, 912 (5th Cir. 1978). This means that, "as a predicate to a determination that the extrinsic offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense. If the proof is insufficient, the judge must exclude the evidence because it is irrelevant." 582 F.2d at 912-13.

Here, the State never provided a full explanation of the evidentiary pattern relating to the proof of the prior crime or an explanation of the materiality. When the district

21

judge asked for the State's input, it essentially remained silent even though it needed to establish the prior crimes' materiality by showing that Hogan committed the crimes and by identifying the disputed 60-455(b) factors. At the end of the district judge's explanation of the reason he was denying Hogan's motion in limine, he projected "evidence that would be produced at trial that there is a causal link between this defendant and the older injuries that this child suffered." Yet before us, the county attorney revealed the State could not prove that Hogan committed the prior crimes when he concluded "that's precisely why [Hogan's] not charged with the crime of child abuse" for any injuries other than those that led to the baby's death.

Hogan obviously agrees with this conclusion, but he also reviewed the trial evidence to show how the State failed to make the causal link the district judge expected. Hogan points to the trial testimony of one of the law enforcement officers who interviewed him and who testified at trial that he had no evidence about who committed any of the injuries suffered before March 23. The officer also testified that the shaking action Hogan demonstrated in his interview would not have caused the traumatic injuries the child suffered over the last two months of his life. Similarly, treating physician Dr. Wells testified a gentle shaking like Hogan described would not have caused the injuries the baby suffered. As Hogan notes, essentially the State wanted the jury to disbelieve his statements that he gently shook the baby a month or six weeks before the baby's death.

The State's prior crime evidence also failed to pinpoint Hogan's statements to a specific prior crime. The State's physician witnesses pointed to potential prior incidents of abuse at several points over a two-month period with the most recent prior incident being within the last 7 to 14 days of the baby's life. While the overall period broadly would include the "gentle" shaking Hogan discussed, his statements do not cover the various other potential incidents discussed by the experts, including the one in the last

22

two weeks. Thus, no expert opinion or other evidence excluded other caregivers as alleged abusers.

The record supports that county attorney's concern about the State's ability to prove who committed the prior crimes.

### 1.4. *Error occurred*

Against this backdrop, Hogan raises the question of what level of proof is necessary when we ask a district judge considering the second step of analysis to determine "whether the evidence has any tendency in reason to prove the disputed material fact." *Torres*, 294 Kan. at 139-40. He presented cases from other jurisdictions that have imposed a specific burden of proof as a test for the predicate admissibility standard, ranging from a low threshold as adopted in federal courts to more rigorous burdens adopted by our sister states. See, e.g., *Huddleston v. United States*, 485 U.S. 681, 685, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988) (applying Federal Rule of Evidence 104[a], which Kansas does not have, to require conditional relevance standard requiring only "sufficient evidence to support a finding by the jury that the defendant committed the similar act"); *State v. Terrazas*, 189 Ariz. 580, 582, 944 P.2d 1194 (1997) (departing from *Huddleston*, listing state cases that have adopted clear and convincing evidence standard or preponderance standard, and holding State must proffer clear and convincing evidence that accused committed crime or civil wrong); *Rugemer v. Rhea*, 153 Or. App. 400, 410, 957 P.2d 184 (1998) (requiring preponderance of evidence that the defendant committed the act). See also *Harrell v. State*, 884 S.W.2d 154, 160-61 (Tex. Crim. App. 1994) (holding that trial court must "make an initial determination at the proffer of the evidence, that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offense" and consider the strength of the evidence in conducting prejudice finding).

The State did not respond to Hogan's citation of these cases. It thus has abandoned any argument related to the question. See *State v. Stuart*, 319 Kan. 633, 639, 556 P.3d 872 (2024) ("'When a party fails to brief an issue, that issue is deemed waived or abandoned.'"). But that abandonment may mean little here because Hogan did not ask us to adopt a standard. He also did not discuss how that standard would fit with our longstanding and long-used rule requiring judges to find "whether the evidence has any *tendency in reason* to prove the disputed material fact." (Emphasis added.) *Torres*, 294 Kan. at 139-40; see PIK Crim. 4th 51.030 (K.S.A. 60-455 instruction referring to "tending" to prove); see also *State v. Ervin*, 320 Kan. 287, 295, 566 P.3d 481 (2025) (using tending to prove); *State v. Folwell*, 14 Kan. 105, 109, 1874 WL 1129 (1874) (same); Cambridge Online Dictionary, "Tend" (defining "tend" as "*to be likely* to behave in a particular way or have a particular characteristic" [emphasis added]).

Without full briefing by either party on the issue, we determine we should not resolve this question, especially because the State's argument before us explained the State did not feel it had the evidence necessary to charge Hogan with a prior crime after a law enforcement investigation. In similar situations, our sister states have held a prior crime statute cannot be the vehicle for introducing prior crime evidence if the government lacks evidence to charge defendant with the prior crime.

*State v. McCarthy*, 156 Vt. 148, 589 A.2d 869 (1991), provides an example. There, the government had investigated but not charged a prior crime against a defendant facing charges of sexual abuse against one of his children. Yet the prosecutor asked several witnesses about the prior alleged crime of sex abuse against another of the family's children and made it a significant part of the trial. The defendant argued on appeal that the allegations and attempts to prove the prior crime required reversing his conviction because the government should not use that state's

24

prior crime statute when it had determined it could not prosecute the defendant based on the facts uncovered in the investigation of the claim about prior abuse. The appellate court agreed and found that the trial court had erred. The appellate court noted that the defendant had failed to preserve the issue at trial, but it held the rarely used plain error doctrine allowed reversal of the conviction because of the prejudice that resulted. 156 Vt. at 154-55.

*McCarthy* based this ruling largely on prejudice. Applying the *Claerhout/Boysaw* factors, we too could find an abuse of discretion when we look at the entire trial record, as compared to the pretrial record available to the district judge when he denied Hogan's motion in limine. See *Claerhout*, 310 Kan. at 930 (quoting *Boysaw*, 309 Kan. at 541). The weight of the evidence that Hogan committed a prior crime was disputed. Also, as we will discuss more in weighing the reversibility of the error, the evidence could contribute to an improperly based verdict. But we find more persuasive the position of the Fifth Circuit in *Beechum*, 582 F.2d at 912-13. That court stated that when proof of who committed the prior crime is insufficient, the evidence is irrelevant and a prior crimes statute like K.S.A. 60-455 cannot be used to introduce prior crimes evidence.

Applying the de novo materiality standard, we conclude the State failed to establish the basis for the prior crimes evidence and error occurred when it was submitted to the jury.

1.5.    *Prejudicial error*

Having found error, under K.S.A. 2024 Supp. 60-261 we must now consider whether the error was harmless or whether it requires reversing both of Hogan's convictions. The erroneous admission of evidence is harmless unless it affects the defendant's substantial rights. *State v. Carapezza*, 286 Kan. 992, 1005, 191 P.3d 256

(2008). The State as the party benefitting from the erroneous admission of this evidence bears the burden of proving the error was harmless. *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012).

Hogan's brief uses our statutory harmless error standard from K.S.A. 2024 Supp. 60-261, which disregards errors that do not affect the substantial rights of the parties to determine whether there is a "reasonable probability that the error will or did affect the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011). We thus apply that standard to discern whether the error was harmless.

The evidence showed the baby was injured up to 12 hours before his father called 911 to report that his son was not breathing. The evidence established that two adults had access to the baby during that timeframe: his father and his mother. Some evidence suggests the injuries occurred just before the baby vomited and became unresponsive; in other words, not long before those events. This evidence points to Hogan as the abuser. But other evidence suggests that hours may have passed after the baby was fatally injured, especially given that someone without medical training might dismiss vomiting or lethargy as being caused by problems other than a brain or spinal injury. Some evidence suggested the child vomited in the mother's care before she left for work in the morning and that the child slept most of the morning, stirring to eat before briefly going back to sleep until he ultimately woke and soon after stopped breathing and appeared generally nonresponsive. This evidence points to the mother as the abuser. The evidence at this point appears to be subject to the jury's weighing of the expert testimony as it determines which of the baby's parents inflicted the fatal injuries.

The jury instruction, which the State repeatedly argued prevented reversible error, shifted the factors the jury could consider in making this weighing. It allowed the jury to use the evidence of "prior injuries" to determine "an absence of mistake or accident, whether the defendant's alleged actions were done knowingly on or about March 23,

26

2021, or in weighing the credibility of statements made by the defendant in the recordings admitted into evidence in this case." These items pointed to Hogan as the person who committed the prior crime, and this sentence of the instruction pointed to no other possible offender. If anything, here, the instruction exacerbated the error. Pointing to Hogan in this way fueled a sense he lied in his statement and had a propensity to commit crimes.

We also note that there was no evidence that the prior injuries exacerbated or contributed to the fatal injuries. The State admitted as much at oral argument, and the testimony is largely consistent with this conclusion. Dr. Weeks agreed in responding to questions that the healing injuries did not kill the child and his prior injuries would have healed correctly with time. She hedged when answering a later question, stating there may have been prior injuries that contributed to the severity of an injury or injuries leading to the baby's death. But she did not connect this exacerbation to creating any issue in treatment and did not relate it to the cause of death. Thus, no evidence establishes the existence of the prior injuries had any bearing on the cause of the baby's death and would be admissible for that reason independent of K.S.A. 2024 Supp. 60-455.

Against this background, we conclude a reasonable probability exists that admitting evidence of prior injuries affected Hogan's substantial rights. Further, the admission of evidence of prior injuries and the inference imposed by the instruction allowing use of that evidence was highly prejudicial. The State cannot meet its burden to show that the error was harmless.

Because the evidence of prior injuries was not relevant and undermined Hogan's right to a fair trial on both charges against him, we reverse his convictions and remand for further proceedings.

## 2. *Remaining issues on remand*

We note that some issues discussed by the parties that we have not discussed might arise again in the remanded proceedings. We will thus discuss them briefly.

First, as we have noted, the State largely focused on the difficulty of separating the old injuries from the new. The State particularly focused on the autopsy report. The district judge likewise mentioned this when he denied Hogan's motion for a new trial. There, the judge found "that it would have been wholly impractical, if not impossible, for a doctor to explain the various differences in tissue of this child without showing that some was old and healing and some was new."

Unfortunately, this question was not discussed or vetted before or during the trial, giving us no basis to determine whether efforts to separate the evidence were discussed, what options might have been explored, and whether it was verified that the experts could not handle a limitation on the scope of their testimony or with the use of redacted records. Certainly, in other cases, the parties and judges have found paths through which prior injuries were essentially ignored and only current, acute injuries were discussed. But in others the segregation could not be made.

On remand the possibilities of segregating evidence should be discussed. And if it cannot be segregated, the parties should consider remedial actions to reduce prejudice.

Finally, we note that one issue raised by Hogan on appeal takes issue with a jury instruction that told the jurors that they "*may* not convict the defendant of felony murder if you do not find the defendant *guilty* of child abuse." (Emphases added.) The judge's decision to use the word "may" resolves many of the issues Hogan raises about how this instruction limited the jury's range of choices. But he argues there are better ways to leave this discretion to the jury other than requiring two convictions instead of simply

requiring a finding of child abuse to support the felony murder. We do not rule specifically on the issue because, given the briefing and the argument, the parties may develop alternatives. But we point out the controversy to draw awareness to the questions raised here.

CONCLUSION

Having found reversible error based on the use of evidence of prior crimes as presented in the record of Hogan's trial, we reverse his convictions and remand this case for further proceedings.

Reversed and remanded.

WILSON, J., not participating.